(No. 54047

GENERAL MOTORS CORPORATION, Appellee, v. WILLIAM M. BOWLING, Director of Labor, *et al.* (UAW Local 694 *et al.,* Appellants).

*Opinion filed June 26, 1981.—Rehearing denied October 19, 1981.*

Harold A. Katz, Irving M. Friedman, Michael B. Erp, and Stanley Eisenstein, of Katz, Friedman, Schur & Eagle, of Chicago, for appellant.

Ellis A. Ballard, of Pope, Ballard, Shepard & Fowle, of Chicago (Otis M. Smith and James R. Wheatley, of Detroit, of counsel), for appellee.

Tyrone C. Fahner, Attorney General, of Springfield (Joseph D. Keenan III, Assistant Attorney General, of Chicago, of counsel), for William A. Bowling, Director of Labor.

Asher, Goodstein, Pavalon, Gittler, Greenfield & Segall, of Chicago, for *amicus curiae* Illinois State Federation of Labor and Congress of Industrial Organizations.

MR. JUSTICE SIMON delivered the opinion of the court:

The question raised by this appeal is whether certain employees of General Motors Corporation (GM) are entitled to unemployment compensation benefits. Claimants were shop clerks employed at GM's Electro-Motive Division plants in Chicago and La Grange, and belonged to United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) Local No. 694. These plants employed 275 shop clerks. There were approximately 7,000 production workers in the two plants, and they belonged to UAW Local No. 719.

The collective bargaining agreement for members of Local No. 719 was negotiated separately from the agreement covering the shop clerks. The bargaining on behalf of production workers was conducted in national negotiations held in Detroit; the contract for the shop clerks was negotiated by their own local. When negotiations for the production workers had been concluded nationally, the contract covering shop clerks was negotiated, and certain items in the national agreement were usually incorporated into that contract.

During national negotiations in 1970, members of Local 719 struck at both the Chicago and La Grange plants, along with other GM employees in other places, as part of a selective strike designated by the UAW. The shop clerks did not strike and they did not picket. They crossed the picket lines and continued to work. Eventually, because of a shortage of work, some of the shop clerks were laid off, although some continued to work throughout the strike. The shop clerks who were laid off are the claimants in this case.

The Director of Labor allowed benefits, and the circuit court of Cook County confirmed that decision, over the employer's challenge. The appellate court reversed, holding that by paying union dues, part of which went to a strike fund which contributed to the production workers' strike, the shop clerks financed the strike that caused their unemployment, and so were ineligible for benefits. (87 Ill. App. 3d 204.) We granted the claimants leave to appeal.

Section 604 of the Unemployment Compensation Act provided:

> "Labor dispute. An individual shall be ineligible for benefits for any week with respect to which *** his *** unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is *** employed, *provided, that this Section shall not apply if *** (A) he is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work and (B) he does not belong to a grade or class of workers *** any of whom are participating in or financing or directly interested in the dispute.*" (Emphasis added.) (Ill. Rev. Stat. 1969, ch. 48, par. 434.)

The italicized clause is commonly known as the "relieving proviso." The Act has since been amended; but the provisions at issue here have not materially changed.

The claimants are ineligible only if both (1) their unemployment was due to a stoppage of work which existed because of a labor dispute at the premises where they worked, and (2) they or others of their grade or class were participating in, financing, or directly interested in the labor dispute. We conclude that the claimants are within the relieving proviso, in that neither they nor anyone of their grade or class participated in, financed, or had a direct interest in the dispute. It is therefore unnecessary to decide whether their unemployment was due to a stoppage of work caused by a labor dispute at their premises. Regardless of the answer to that question, the

claimants are eligible for unemployment benefits.

GM does not contend that the claimants were of the same grade or class as the striking production workers. Clearly, at least for the purposes of this case, the grades or classes of workers to which the claimants belong do not extend beyond the shop clerks' unit. See *Shell Oil Co. v. Cummins* (1955), 7 Ill. 2d 329.

None of the shop clerks—the claimants or other workers of their grade or class—participated in the labor dispute. They did not strike or picket or otherwise interfere with GM's operations. They came to work every day, crossing the production workers' picket lines with passes from the international union, until GM laid them off.

Nor were the shop clerks "directly interested" in the dispute. Certain parts of the production workers' national agreement would customarily be copied into the shop clerks' own agreement. The shop clerks, therefore, might anticipate that the strike would influence their terms of employment. That, however, is at most an indirect interest. All they had was a hope, not any assurance. A mere expectancy without any legal right, subject to GM's views on the fairness and convenience of adopting parts of another agreement, does not disqualify the shop clerks for unemployment benefits. It is no greater an interest than, say, a Ford worker had at the time; for in 1970 it was usual for the other auto makers to go along with the deal worked out by the union and its "target" company, in the case of these negotiations GM. The appellate court's opinion includes a more thorough discussion of this point, which we need not repeat. 87 Ill. App. 3d 204.

The issue, then, is whether the shop clerks financed the strike. Some of them, in the spirit of labor solidarity, volunteered their skills to help the striking local in its office, for example by making out the checks from the strike fund to the strikers. That, however, is not "financing" the strike, as GM recognizes. This case is about

whether the shop clerks financed the strike by paying union dues.

The strike was financed by the international union's strike fund. The international doled out money to those locals that went on strike, including the production workers' local (Local No. 719) at the Electro-Motive plants in Chicago and La Grange, for the support of the strikers. Part of each member's regular monthly dues, including the dues of the shop clerks, was earmarked for the strike fund; in addition, the international union assessed special double dues in anticipation of the strike, to build up the fund. After the strike, the international union also assessed special dues against members who had worked through the strike, including some of the shop clerks. However, the payments were indirect, small, and hard to trace. The claimants paid no money directly to the striking local; they paid their dues to the international, where the money was commingled with the dues of all other UAW members around the country. Then, Local No. 719 was not the only local on strike; it got only some small part of the available funds. There is no way to say exactly what money, or how much money, passed from the claimants through the international to the striking workers at the claimants' own plant; and if we assume some sort of fair prorating, the amount in question is clearly insignificant.

The word "financing," moreover, implies something active and voluntary. If the city paid strike benefits, that would not make every taxpayer a financer of the strike. The claimants assert that they had no real choice but to pay their dues and assessments. They worked in a union shop; anyone who refused to pay would have been fired. The General Assembly, the claimants contend, did not mean to force workers to risk imminent unemployment to maintain their eligibility for unemployment benefits if they later got caught in the middle of someone else's strike. That would be too hard a choice.

GM responds that if union dues are compulsory, that is the union's doing, not the company's; and it is the shop clerks themselves who vote in the union and instruct it how to behave. At least a majority of the shop clerks freely chose to join the international and pay its dues, including such special assessments as the international might levy from time to time in accordance with its constitution.

The Director of Labor agreed with the claimants on this point, as did the circuit court. The Department of Labor has long taken the position that paying union dues is not financing a labor dispute. (See *Sangamo Electric Co. v. Donnelly* (1962), 26 Ill. 2d 348, 360.) Its interpretation of the statute, although not binding on a court, is entitled to respect; if it is reasonable, the court should incline to sustain it.

We agree with the Director and the claimants. A payment of money is not "financing" a labor dispute unless there is a meaningful connection between the payment and the dispute (*Baker v. General Motors Corp.* (1980), 409 Mich. 639, 297 N.W.2d 387), such as a purpose to support the strike. Thus, in *Outboard, Marine & Manufacturing Co. v. Gordon* (1949), 403 Ill. 523, the court held that the claimants were not financing a strike even though their union regularly paid part of their dues to the striking union: the payments were for administrative services and were not meaningfully related to the strike. Here, when a connection developed between the shop clerks' dues and the production workers' strike, the shop clerks had no choice about paying them. The shop clerks' voluntary choice was to join the international, establish a union shop, and pay whatever dues might be called for from time to time. They made that decision not to aid the present strike, which was then unimagined, but rather to assure themselves adequate support in their own labor disputes, when necessary. The strike fund is a sort of private insur-

ance against unemployment due to strikes. One does not pay insurance premiums to finance other people's claims, but to provide for one's own need. To the extent the shop clerks' payments were voluntary, they were not meaningfully connected to the labor dispute; to the extent they were sufficiently related, they were not voluntary. The union dues, therefore, did not constitute financing.

The essential fact of this case is that it is only coincidence that the shop clerks belonged to the same international union as the strikers. That membership did not affect the progress of the labor dispute; had the shop clerks belonged to some other union, and paid their dues into some other strike fund, while persons similarly employed at another plant belonged to Local No. 694, everything would have happened just as it did, except that the striking union (Local No. 719) might not have been so willing to let the shop clerks keep working. The shop clerks in that hypothetical would clearly have been covered by the relieving proviso and so eligible for benefits; the members of the other local of UAW would also have been eligible because they would be at a different establishment. The shop clerks should not be denied benefits simply because they were unlucky enough to get caught in the repercussions of a strike at their own plant by people fortuitously associated with the same strike fund. Such a discrimination would be unrelated to any purpose or policy of the statute.

The effect of interpreting "financing" as GM suggests would be to burden, arbitrarily, affiliations among bargaining units at the same establishment. Only by remaining independent, or affiliating solely with workers at other plants, could local bargaining units assure that no innocent bystanders would be denied unemployment compensation. As GM itself urges, the policy of this State is to remain neutral in labor disputes (*Buchholz v. Cummins* (1955), 6 Ill. 2d 382) and collective bargaining gen-

erally. To favor one form of labor organization—or dis-organization—over another would not be neutral. This court should not lightly impute to the legislature a policy of discouraging various workers at a plant from pooling their resources in one large union. The Act judges claimants by where they work and in what grade or class, not by what international union they belong to. The shop clerks and the international should not have to bear the cost of their unemployment simply because they are members.

The financing disqualification has been called a "dead letter." (Shadur, *Unemployment Benefits and the "Labor Dispute" Disqualification,* 17 U. Chi. L. Rev. 294, 328 (1950).) This is not the case to resurrect it. The claimants are entitled to their benefits.

*Appellate court reversed; circuit court affirmed.*