(No. 63058.—

THE NORTHERN TRUST COMPANY, Appellee, v. E. ALLAN BERNARDI, Director of Labor, Appellant.

*Opinion filed January 30, 1987.*

356

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, and Rosalyn B. Kaplan, Assistant Attorney General, of Chicago, of counsel), for appellant.

Julie Badel and Patricia L. Martin, of McDermott, Will & Emery, of Chicago, for appellee.

JUSTICE SIMON delivered the opinion of the court:

The Northern Trust Company initiated this action seeking judicial review of the Director of Labor's March 25, 1983, decision assessing the Northern Trust $201,849.29, plus interest, on account of unpaid unemployment-insurance contributions for the years 1978 through 1981. The circuit court of Cook County affirmed the Director's assessment but reduced the amount of interest owed. The appellate court reversed, concluding that the method utilized in determining the unpaid contributions was not authorized by the statute and that the circuit court had improperly restricted the time frame in which interest could be charged. (139 Ill. App. 3d 248.) The Director sought leave to appeal, which we allowed. 103 Ill. 2d R. 315(a).

The issue presented is technical, and an understanding of how unemployment-compensation contribution rates are determined is essential for dealing with it. Rates for an employer who has incurred liability within each of the three calendar years preceding the year for which a rate is to be determined are calculated by multiplying the employer's "benefit wage ratio" times a State-experience factor and then adding an emergency contribution rate set by statute. (Ill. Rev. Stat. 1981, ch. 48, pars. 576.1, 576.2.) The benefit-wage ratio is the most significant fac-

tor of the equation, and the makeup of that ratio is disputed in this case. As defined by section 1503(A) of the Unemployment Insurance Act (Ill. Rev. Stat. 1981, ch. 48, par. 573(A)), the ratio is arrived at by dividing the employer's "benefit wages" (a figure related, though not equal, to unemployment-compensation claims charged against the employer's account) by the total "wages *** on which contributions were paid" (referred to by the parties as "wages on which"). For an employer with five or more continuous years of experience, the benefit wages and "wages on which" comprising the benefit-wage ratio are the total benefit wages and "wages on which" for the 36 calendar months ending on the last day of June which immediately precedes the calendar year for which a rate is being determined. The purpose of the ratio is to introduce an experience component into the unemployment-compensation contribution rate, an employer's experience over three years being largely determinative of his liability to the unemployment trust fund for the succeeding year. Bernstein, The Illinois Unemployment Insurance Act, Ill. Ann. Stat., ch. 48 (pars. 138.13 to 850), at XLI (Smith-Hurd 1986).

For example, in determining the Northern Trust's 1979 benefit-wage ratio, the total benefit wages of the Northern Trust from July 1, 1975, through June 30, 1978, would supply the numerator and the total "wages on which" for the same period the denominator. Those figures amounted to $925,040.25 and $44,020,260.07 respectively, or a ratio of 2.101%. Multiplied by the State-experience factor of 126 (actually 1.26 in the equation) for 1979 and supplemented with the emergency contribution of 0.3%, the formula produces a 1979 contribution rate of 2.9% of the Northern Trust's taxable wages. However, the Director has determined that the Northern Trust should have paid at a rate of 3.0% in 1979, and at rates in 1980 and 1981 higher than those which the

Northern Trust concedes. The issue presented by this appeal is whether the method by which the Director has determined higher rates for those three years is authorized by statute.

This confrontation over methodology is rooted in an error which occurred in 1978. For that year, the Director assessed a rate of 2.0%, at which rate the Northern Trust claims to have made timely contributions each quarter. Likewise, the Northern Trust claims to have paid contributions for each quarter of 1979, 1980 and 1981 at the rates then assigned by the Director. For reasons which the record does not disclose and which are immaterial to this decision, on April 7, 1981, the Director revised the 1978 rate from 2.0% to 2.2%, and the parties agree that the Northern Trust's contribution rate for 1978 should have been 2.2%, not 2.0% as charged and paid. Because the Northern Trust did not pay the extra 0.2% on 1978 taxable wages within 30 days of the Director's April 7, 1981, revision, the Director reduced the Northern Trust's "wages on which" for the second, third and fourth quarters of 1978 (an overpayment for the first quarter of 1981 eliminated the deficiency for the first quarter of 1978). That modification increased the Northern Trust's benefit-wage ratio and consequent contribution rates for the years 1979, 1980 and 1981, leading to a total deficiency of $201,849.29, as computed by the Director.

The Director contends that, under section 1503(A), the denominator of the benefit-wage ratio may include an amount of taxable wages for each quarter only as large as the contribution actually paid, divided by the properly revised contribution rate. For example, if taxable wages in a particular quarter amounted to $1,000 and the employer paid 2%, or $20, and if the rate for that quarter was later increased to 4% ($40) but the employer did not remit the additional $20, according to the Director's interpretation

of section 1503(A) the employer should receive "wages on which" credit for that quarter only for the amount of taxable wages on which he paid the full 4% contribution. In this example, the employer has paid only $20 when he was supposed to have paid at 4%, so he is credited with having paid the full 4% contribution on only $500 (.04 x 500 = 20). Thus the employer is, by the Director's computation, entitled to only a 50% "credit" for that quarter, or "wages on which" for purposes of the benefit-wage ratio of one-half ($500) of the taxable wages on which contributions were made ($1,000).

Having revised the rate upward for 1978 and not received a speedy remittance of the deficiency from the Northern Trust, the Director proceeded to reduce the "wages on which" credit for the three quarters of 1978 for which the revision had created deficiencies. During the second-quarter of 1978, the Northern Trust paid its employees $5,698,586.48 in taxable wages, but it made an unemployment-compensation contribution of $114,251.61. That contribution, although 2.0% of $5,698,586.48, is 2.2% (the revised contribution rate) of $5,193,121.86, so the Director utilized a second-quarter 1978 "wages on which" figure of $5,193,121.86 to redetermine the Northern Trust's modified "wages on which" for the 36 months ending with the second quarter of 1978, thereby reducing the denominator and enlarging the benefit-wage ratio from 2.101% to 2.126%. Based on the greater ratio, the Director increased the 1979 contribution rate from 2.9% to 3.0%. The increased 1979 rate caused the Northern Trust to have a deficiency for every quarter of that year. Without advising the employer of the revised 1979 rate based upon the failure to pay the 1978 rate revision, and then allowing 30 days for the employer to remit payment to cover the resultant deficiencies (as the Director's method requires), the Director reduced the Northern Trust's "wages on which" for every quarter of 1979 in ac-

cordance with the percent-credit method outlined above. The methodology employed by the Director led to a recalculation of the 1980 rate using the reduced "wages on which" for the last three quarters of 1978 and the first two of 1979, and the 1980 rate was raised from 2.8% to 3.0%.

As might be supposed, revision of the 1980 rate created deficiencies for all of 1980, leading next to a revision of the 1981 rate using the modified "wages on which" from the second quarter of 1978 through the second quarter of 1980. The Director imposed a revised 1981 rate of 2.5%, but a rate of 2.2% would, according to the Northern Trust, have been proper had unmodified, rather than modified, "wages on which" been used.

The difference between the amount of unpaid contributions as determined by the Director using modified "wages on which" and the amount which the Northern Trust concedes to be owed is summarized:

| Quarter/ Year | Deficiency Using Modified Wages on Which | Deficiency Using Unmodified Wages on Which |
|---|---|---|
| 2/78 | $ 11,117.29 | $ 11,117.29 |
| 3/78 | 4,895.23 | 4,895.23 |
| 4/78 | 2,751.21 | 2,751.21 |
| 1/79 | 32,275.98 | 21,348.06 |
| 2/79 | 20,200.49 | 14,159.19 |
| 3/79 | 8,442.88 | 6,025.83 |
| 4/79 | 5,435.84 | 4,070.60 |
| 1/80 | 56,235.36 | 43,923.75 |
| 2/80 | 20,116.37 | 13,396.28 |
| 3/80 | 8,113.66 | 5,388.44 |
| 4/80 | 4,549.25 | 3,053.50 |
| 1/81 | ———— | (69,289.33) |
| 2/81 | 27,715.73 | 6,617.71 |
| | $201,849.29 | $67,457.76 |

(The overpayment which the Northern Trust claims in the first quarter of 1981 was applied by the Director to pay the first quarter 1978 deficiency and interest.) The Northern Trust claims that the difference of $134,391.53 between the two sums is attributable entirely to the modification of 1978 "wages on which" and its snowballing effect in later years. That modification was made solely because the Northern Trust did not pay the 1978 deficiencies within one month of the 1981 revision notice. Because the $134,391.53 difference is assessed in addition to the amount necessary to compensate the trust fund for the admitted 1978 deficiency, and would not have been assessed had the Northern Trust tendered prompt payment, the Northern Trust claims that it constitutes a penalty not authorized by law.

The Director argues that the method he applies is supported by the language of section 1503(A), which allows employers 31 days following the close of the second quarter in which to make that quarter's contribution and earn full "wages on which" credit. The statute provides that the benefit-wage ratio for an employer with the Northern Trust's length of experience equals "the total of his benefit wages for the 36 consecutive calendar month period ending on the June 30 immediately preceding that calendar year, divided by his total *wages* for insured work for the same period *on which contributions were paid to the Director on or before July 31 immediately following such June 30.*" (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 48, par. 573(A).) Although an employer cannot pay a 1981 retroactive rate increase for the second quarter of 1978 by July 31, 1978, the Director claims to be following the methodology of section 1503(A) by allowing employers one month to satisfy a retroactive increase before making a downward modification of "wages on which" for the affected quarters.

According to the Director, his application of section

1503(A) in this case prevents the Northern Trust from reaping an unfair advantage: paying at the relatively lower contribution rates for 1979 through 1981 determined with full "wages on which" credit despite its failure to pay its entire 1978 contribution at the revised rate. If the Northern Trust had made its 1978 contributions at 0.2% less than the contemporaneously assigned rate, there is no question that its "wages on which" for 1978 would be reduced by operation of section 1503(A). Therefore, the Director argues, upward revision of this employer's 1979 through 1981 rates, accomplished by downward modification of its "wages on which," has put the Northern Trust in the same position it would have occupied had it failed to make proper contribution payments at the end of each quarter of 1978.

We do not agree with the Director that his retroactive modification of 1978 "wages on which" placed the Northern Trust in the same position as an employer who ignored an initial 1978 rate notice of 2.2% and paid at a 2.0% rate. Had the Northern Trust done that, only its 1979 rate would have been affected by its incomplete contribution, at least until July 31, 1979. On that date, the Northern Trust might well have settled its dispute with the Director and have been entitled to full credit for its 1978 "wages on which" for purposes of the 1980 rate calculation.

In other words, the Northern Trust had 13 months from the end of the second quarter of 1978 before an insufficient contribution for that quarter would adversely impact upon its 1980 rate. It had 25 months to cure the deficiency before the benefit-wage ratio for 1981 would have been affected. So far as the third and fourth quarters of 1978 are concerned, the Northern Trust had until July 31, 1979, to settle its unemployment-compensation account before those two quarters would have adversely impacted upon any year's rate determination.

Furthermore, initial rate revisions are issued in the first quarter of the calendar year for which they are effective (Bernstein, The Illinois Unemployment Insurance Act, Ill. Ann. Stat., ch. 48 (pars. 138.13 to 850), at LIX (Smith-Hurd 1986)), and employers are given immediate rights to challenge those rates (Ill. Rev. Stat. 1981, ch. 48, par. 579). Employers are thus given several months to contest an initial rate determination before having to decide whether they should pay more than they believe is owed and file for a refund, or pay less than the Director demands and possibly suffer an increased rate for the succeeding year. In this case, however, the Director applied section 1503(A) in a manner he deemed appropriate and gave the Northern Trust only 30 days to pay upon notifying it on April 7, 1981, of the 1978 rate revision, after which not one, but three years' rates were adversely affected.

It is not disputed by the Director that had the Northern Trust paid the 1978 deficiency within 30 days of the rate revision its rates for later years would not have been adjusted. Yet, the Director maintains in this court that the Northern Trust has not been penalized for its refusal to pay the 1981 revision of 1978 rates within 30 days, notwithstanding a $134,391.53 increase in the Northern Trust's liability on account of that refusal. Such an increase can only be considered penal in nature, as it constitutes a sanction imposed by the State to prod reluctant employers into compliance with the Director's interpretation of governing statutes. See *Hoffmann v. Clark* (1977), 69 Ill. 2d 402, 429 ("[a] penalty is in the nature of punishment for the nonperformance of an act").

Our courts have long maintained, however, that an ambiguous statute will not be construed to impose a penalty (*e.g., Goudy v. Mayberry* (1916), 272 Ill. 54, 58; *Citizens Utilities Co. v. Pollution Control Board* (1972), 9

Ill. App. 3d 158, 165; *Mallinckrodt Chemical Works v. Belleville Glass Co.* (1890), 34 Ill. App. 404, 412); *a fortiori*, the State cannot extract a penalty where the statute contains not even an inkling of authorization. As the appellate court noted in this case, authority for the Director's method of enforcing retroactive rate revisions can only be found by appending to section 1503(A) unenacted language which would limit to 30 days the time in which an employer could pay a retroactive increase and retain full "wages on which" credit for years following the year for which rates were revised. There is simply no legislative indication that the time for paying retroactive rates should be so limited. While it is true that courts defer to the construction of ambiguous statutes by agencies charged with their administration (*Illinois Consolidated Telephone Co. v. Illinois Commerce Com.* (1983), 95 Ill. 2d 142, 152), it is "fundamental that an erroneous construction of a statute by an administrative agency is not binding upon the courts" (*Winakor v. Annunzio* (1951), 409 Ill. 236, 248). Our deference to administrative expertise does not license a "governmental agency to extend the operation of a statute by administrative regulation. If the act is inadequate the remedy lies with the legislature." *P. H. Mallen Co. v. Department of Finance* (1939), 372 Ill. 598, 601.

Contrary to the Director's protestations, our refusal to interpret section 1503(A) in support of his methodology does not lead to an anomolous result. The Director may pursue the Northern Trust's 1978 deficiencies by seeking a civil judgment, enforcing his lien upon property owned by the Northern Trust, and even by enjoining the Northern Trust from conducting business in this State. (Ill. Rev. Stat. 1981, ch. 48, pars. 686, 723, 724.) We hold, therefore, that the statute does not allow revision of past years' rates based upon an employer's failure to pay deficiencies of an earlier year created by a

retroactive rate revision. Rates for years following 1981 have been affected by the Director's modification of the Northern Trust's "wages on which," but they are not at issue in this appeal. Hence, this case does not present the question of whether the failure to pay a retroactive rate revision for a previous year allows the Director to make a downward modification of that year's "wages on which" for purposes of determining the contribution rate for years following the year in which the revision was issued, and we express no opinion on that question.

The appellate court also decided that the Northern Trust owed interest on its 1978 underpayments pursuant to section 1401 of the Illinois Unemployment Insurance Act (Ill. Rev. Stat. 1981, ch. 48, par. 551) and that interest accrued from the dates in 1978 and 1979 on which 1978 quarterly payments were due. While agreeing that it owes additional contributions for 1978 on account of the rate revision for that year, the Northern Trust claims that the Director is estopped from collecting interest in this case. Because the Northern Trust purports to have made timely payment of its 1978 contributions at the then-assigned rates and in good-faith reliance upon the accuracy of those rates, it asserts that being forced to pay interest on account of a retroactive rate increase is grossly unjust.

It seems incongruous for the Northern Trust to concede in one breath that it owes deficiencies (through no fault of its own) from 1978, and to assert in the next that the State is estopped from collecting interest which has inured to the benefit of the Northern Trust on account of its having had those deficiencies. Section 1401 compensates the trust fund for the lost-time value of late payments, but it works no penalty upon an employer who has earned a return by holding those payments without right. (See *People v. Baldwin* (1919), 287 Ill. 87, 91.) The Northern Trust has enjoyed the use of funds to

which it was not entitled, and requiring it to pay interest places the Northern Trust in no worse a position than if it had contributed at the proper rate throughout 1978. Therefore, the Northern Trust can neither claim that its reliance was detrimental—which it has not even attempted to do—nor realistically assert that paying interest will cause it to be the victim of fraud or injustice such as is required to estop the State. (*Rockford Life Insurance Co. v. Department of Revenue* (1986), 112 Ill. 2d 174, 185.) Estoppel is plainly unwarranted in this case.

In *C. O. Baptista Films v. Cummins* (1956), 9 Ill. 2d 259, this court refused to impose interest and penalties for unpaid contributions which should have been made between the time of the circuit court's decision that Baptista Films was exempt from paying contributions and this court's later decision in *Scripture Press Foundation v. Annunzio* (1953), 414 Ill. 339, which overruled the circuit court decision. *Baptista Films* is inapposite to this case, however, since the Northern Trust's 1978 deficiencies were not caused by a change in the law. The Northern Trust's 1978 deficiencies were due in 1978 and 1979, whereas the contributions in *Baptista Films* only became due after the change of law in *Scripture Press*. Thus, *Baptista Films* involved an unusual circumstance not present in this case, and the Northern Trust can find no refuge in its limited holding. To the extent that *Baptista Films* suggests that interest, as opposed to penalties, constitutes a windfall for the State (9 Ill. 2d 259, 266), that case is overruled.

Alternatively, the Northern Trust claims that, if interest is owed, it is owed only from the date of the rate revision in 1981, and not from the dates 1978 contributions were due. The later date is mandated, claims the Northern Trust, because section 1401 provides that interest accrues if an employer does not pay contributions "when required of him," and the Director did not require pay-

ment of the additional contribution until the spring of 1981.

The Northern Trust premises its statutory analysis upon an unrepresentative segment of the statute. In fact, section 1401 requires that an employer pay interest if he has not paid contributions "when required of him by the provisions of this Act and the rules and regulations of the Director, *whether or not the amount thereof has been determined and assessed by the Director.*" (Emphasis added.) (Ill. Rev. Stat. 1981, ch. 48, par. 551.) The law further provides that interest shall begin to accrue "from the day upon which said contribution became due." (Ill. Rev. Stat. 1981, ch. 48, par. 551.) According to the provisions of the Act, "contributions shall become due and shall be paid quarterly on or before the last day of the month next following the calendar quarter for which such contributions have accrued." (Ill. Rev. Stat. 1981, ch. 48, par. 550.) Thus, interest on deficiencies accumulates from the date the deficient contributions were due, not the date on which those deficiencies are later discovered. To hold otherwise would unjustly enrich an employer, at the trust fund's expense, by allowing the employer to retain profits earned with the use of the deficient sums between the dates they were due and demand was made.

One final question remains to be answered; that is, the rate at which interest has accrued. Section 1401 provides that employers shall pay interest of 1% per month, but "[a]fter 1981, such interest shall accrue at the rate of 2% per month, computed at the rate of 12/365 of 2% for each day or fraction thereof, upon any unpaid contributions which become due." (Ill. Rev. Stat. 1981, ch. 48, par. 551.) The Director maintains that interest on the Northern Trust's deficiencies accrued at 1% per month until 1982, when it began to accrue at 2%. The appellate court disagreed, ruling that only unpaid contributions

which became due after 1981 could be charged interest at 2% per month.

Here again, we are in agreement with the appellate court. The statute unambiguously states that after 1981 interest shall be charged at 2% on "unpaid contributions which *become due*," and the reasonable interpretation of that final phrase is that the higher interest rate applies only to debts arising after 1981, not to debts which arose prior to 1982 but remained unpaid thereafter.

For the reasons stated, the judgment of the appellate court is affirmed in all respects. This cause is remanded to the Director of Employment Security for determination and assessment of contributions and interest due from the Northern Trust for the period here at issue and for other proceedings not inconsistent with this opinion. 87 Ill. 2d R. 366(a)(5); Ill. Rev. Stat. 1985, ch. 110, par. 3—111(a)(6).

*Affirmed and remanded,*
*with directions.*