534

HIGHWAY DRIVERS, DOCKMEN, SPOTTERS, RAMPMEN, MEAT PACKING HOUSE AND ALLIED PRODUCTS DRIVERS AND HELPERS, OFFICE WORKERS AND MISCELLANEOUS EMPLOYEES UNION, Local No. 710, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, *et al.*, Plaintiffs-Appellees, v. SALLY WARD, Director of Employment Security, The Department of Employment Security, Defendant-Appellant (BN Transport, Inc., Defendant).

First District (3rd Division)   No. 1—88—3042

Opinion filed July 18, 1990.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Kimary Lee, Assistant Attorney General, of Chicago, of counsel), for appellant.

Donald W. Cohen, of Asher, Gittler & Greenfield, Ltd., of Chicago, for appellees.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant appeals from an order, on administrative review, reversing a decision of the Director of Employment Security (Director). The Director found plaintiffs, Highways Drivers *et al.*, ineligible for benefits under section 604 of the Illinois Unemployment Insurance Act (Act) (Ill. Rev. Stat. 1987, ch. 48, par. 434). We reverse.

The facts are largely undisputed. Plaintiffs-claimants are dock workers who were members of Local 710 of the International Brotherhood of Teamsters Union, and employed by defendant, BN Transport, Inc. The clerical workers of BN Transport and the dock workers were represented in collective bargaining by Local 710. The collective bargaining agreements of the clerical workers and the dock workers were separate; however, both had a common expiration date.

In the fall of 1984, BN Transport merged with Santa Fe Transportation. Following the merger, BN Transport attempted to take its clerical workers out of their bargaining contract with Local 710 and transfer them into the union of the Santa Fe clericals. A dispute over union recognition arose, and as a result, on December 3, 1984, the BN Transport clericals went out on strike at BN Transport's facility.

As a show of solidarity, none of the dock workers crossed the picket line; however, none of the dock workers walked the line with the clericals. Hugh Corcoran, the business agent for the dock workers, and an officer of Local 710, testified that the dock workers were given the choice whether to cross the line. Both the dock workers and the picketing clericals received strike pay from the international union. The strike was settled on or about January 19, 1985. Upon their return to work, the dock workers received no changes in any of the terms and conditions of their employment.

Frank Ciaccia, a city driver employed by BN Transport and a member of Local 705 of the International Brotherhood of Teamsters, testified that when he arrived for work on December 3 there was no equipment in the yard and the gates were locked. At 8:30 a.m., he went inside the terminal for a meeting with Payton, the terminal manager, and a few other drivers. They discussed the seniority list and returning to work; however, they could not work because there were no dock hands and no equipment. Ciaccia stated that since there was no work for the drivers there would also have been none for the dock hands. The drivers did not receive strike pay.

Robert Moline, a vice-president at Santa Fe, testified that the union representatives for Local 705 and for the dock workers had informed him that the Local 705 employees and the dock workers had been instructed to honor the clericals' picket line.

Ralph Perri, vice-president of operations for Santa Fe Transportation, testified that the company was aware, based on an October 1984 letter which he received from the business agents for Locals 710 and 705, that the clericals were going to take some economic actions against the company. On the date the strike began, there was work available for both the dock hands and the city drivers. According to him, some of the city drivers came into the facility and asked if they could report to work; however, none of the dock workers came in.

During the strike, plaintiffs filed a claim for unemployment benefits under section 700 of the Act. (Ill. Rev. Stat. 1987, ch. 48, par. 450.) On February 1, 1985, the claims adjudicator determined that plaintiffs were eligible to receive unemployment benefits for the period during the strike. BN Transport appealed that determination. On August 1, 1985, a hearing was held before the Director's representative, Abe Linderman, to determine whether the claims adjudicator's determination was erroneous. On September 6, 1985, a hearing *de novo* on appeal was held before Linderman.

On December 16, 1985, Linderman issued a report recommending that the determination of the claims adjudicator be set aside in part

and that claimant dock workers be found ineligible for unemployment insurance benefits. The Director affirmed and adopted his report.

On April 24, 1986, plaintiffs filed a complaint for administrative review (Ill. Rev. Stat. 1987, ch. 110, par. 3—101 et seq.), seeking reversal of that part of the Director's decision which held that the dock workers were ineligible for unemployment. The circuit court reversed the Director's decision as against the manifest weight of the evidence and contrary to law. Defendant appeals that reversal.

■■ It has long been established that, in an unemployment insurance case, the board is the trier of fact and its factual findings are considered prima facie true and correct. (London v. Department of Employment Security (1988), 177 Ill. App. 3d 276, 279, 532 N.E.2d 294; Ill. Rev. Stat. 1987, ch. 110, par. 3—110.) Factual findings will not be disturbed absent a finding that they are against the manifest weight of the evidence. (See Jackson v. Board of Review of the Department of Labor (1985), 105 Ill. 2d 501, 475 N.E.2d 879, superseded by statute as stated in Siler v. Department of Employment Security (1989), 192 Ill. App. 3d 971, 549 N.E.2d 760; Kelley v. Department of Labor (1987), 160 Ill. App. 3d 958, 513 N.E.2d 988.) The same deference is not accorded with respect to legal questions such as the construction of a statute. Northern Trust Co. v. Bernardi (1987), 115 Ill. 2d 354, 365, 504 N.E.2d 89; Zbiegien v. Department of Labor (1987), 156 Ill. App. 3d 395, 510 N.E.2d 422.

Here, the Director found that for the period of the strike, plaintiffs did not cross the picket line, that plaintiffs' business agent participated in the picketing with the clerical workers, and that plaintiffs received strike benefits for the duration of the strike. These factual findings were not against the manifest weight of the evidence. However, based on these findings, the Director concluded that plaintiffs' conduct, as a whole, constituted participation in a labor dispute, which disqualified them for unemployment insurance benefits. The Director's finding that plaintiffs "participated" in the dispute was actually a construction of section 604 of the Act; accordingly, we need not defer to the Director's findings here as we would to her findings of fact.

In their brief, plaintiffs devote a fair amount of discussion to whether they had a direct interest in or financed the dispute. It is not contended that plaintiffs' disqualification resulted from either direct interest or from financing the dispute. The singular issue presented for our review is whether, as a matter of law, plaintiffs' conduct constituted participation under the meaning of the Act.

■■ Section 604 of the Illinois Unemployment Insurance Act provides, in pertinent part:

"An individual shall be ineligible for benefits for any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed. \*\*\*
\*\*\*

This Section shall not apply if it is shown that (A) the individual is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work and (B) he does not belong to a grade or class of workers of which immediately before the commencement of the stoppage there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute \*\*\*." Ill. Rev. Stat. 1987, ch. 48, par. 434.

Under the Act, a claimant, to avoid ineligibility, must establish that he falls within both of the statutory exceptions. (*Cottini v. Cummins* (1956), 8 Ill. 2d 150, 154, 133 N.E.2d 263.) While clearly the claimants here did not belong to the same grade or class as the striking employees, we believe that they did participate in the labor dispute and were correctly disqualified for unemployment insurance.

Plaintiffs place great reliance on *General Motors Corp. v. Bowling* (1981), 85 Ill. 2d 539, 426 N.E.2d 1210. There, our supreme court held that payment into a strike fund by members of the same union as the striking union members could not be considered financing the strike. Thus, such payments would not be a disqualifying factor for purposes of eligibility for unemployment insurance. We find *General Motors* to be inapposite to the present case because the court there made no finding as to the effect of receipt of strike benefits on eligibility for unemployment insurance.

■ Participation is not defined in the Act. However, Illinois courts which have addressed the issue have determined that in order to show that an employee is participating in a labor dispute, an employer must show more than the employee's failure to cross a picket line. (*Nestle Co. v. Johnson* (1979), 68 Ill. App. 3d 17, 20, 385 N.E.2d 793; *Owens-Illinois, Inc. v. Bowling* (1981), 99 Ill. App. 3d 1117, 429 N.E.2d 172, *aff'd as modified* (1983), 95 Ill. 2d 397, 447 N.E.2d 1324.) Participation may be shown by other evidence in a case where the failure to cross a picket line is also in evidence. *Nestle*, 68 Ill. App. 3d at 20.

Plaintiffs argue that neither the receipt of the strike benefits, nor the failure to cross the picket line, alone, would constitute participa-

tion in the strike. Therefore, they conclude, this conduct should not be considered in the aggregate as a disqualifying factor. We disagree.

Corcoran testified that in his 35 years as a union member, he had not heard of strike benefits being paid to any union member who crossed a picket line and went to work. At oral argument, plaintiffs stated that strike benefits could be paid for a variety of reasons; however, they offered none. If the strike benefits here were paid for reasons other than to compensate the dock workers for their participation, it was incumbent upon plaintiffs to produce some proof of that. Plaintiffs did no more than assert that they had a right not to cross the picket line.

We believe that participation in a strike is the triggering event for the payment of strike benefits. The payment of these benefits enabled plaintiffs to remain away from work until the dispute was settled. Once the dispute was settled, payment of strike benefits ceased. We do not consider the facts here to be so unrelated as to require us to consider each of them in isolation.

Neither party has directed this court to any cases which directly address the issue of whether receipt of strike benefits constitutes participation in a labor dispute. Our research has yielded only sparse authority on the issue, and none in Illinois. Of those cases which we reviewed, receipt of strike benefits was a factor weighing in the determination of disqualifying participation.

*Campos v. California Employment Development Department* (1982), 132 Cal. App. 3d 961, 966, 183 Cal. Rptr. 637, 639, a case which addressed whether workers on indefinite layoff were disqualified from receiving unemployment benefits, stated that in making a determination as to whether an employee is "personally responsible" for his unemployment and therefore ineligible to receive unemployment insurance, courts have relied on such factors as union membership, identity of interest in the dispute, whether work was actually available during the strike, picketing activities and receipt of strike benefits.

In *Brown v. Brown* (La. App. 1963), 158 So. 2d 305, *cert. denied* (1964), 377 U.S. 979, 12 L. Ed. 2d 747, 84 S. Ct. 1885, members of the nonstriking local union, which was a member of the same international union as the striking local union, were found to have participated in the labor dispute between the striking local and the employer by recognizing and refusing to cross the picket lines. There, the court held that the nonstriking employees' interest in the strike was manifested considering the proffer of strike benefits made by the international and the fact that said benefits were being held in escrow for

payment to the claimants upon their disqualification for unemployment benefits becoming final.

Similarly, in *Post-Times Co. v. Turner* (Fla. App. 1960), 123 So. 2d 359, some of the members of the International Typographical Union, Local 162, refused to cross the picket line of a separate labor union, the International Stereotypers and Electrotypers Union, Local 106. For the period of time that the dispute was actively in progress, the nonstriking employees were considered to be participating in the strike and, therefore, not eligible to receive unemployment benefits. (123 So. 2d at 361.) Subsequent to the strikers' withdrawal of their picket line, but during the period of the labor dispute, the nonstriking members applied for unemployment insurance, and an order was entered finding them eligible. The appellate court quashed the order, holding that among the factors which supported a conclusion of ineligibility, the claimants received strike benefits from their union for the duration of the picketing and for the period subsequent to the withdrawal of the picket line. The court stated that while these facts standing alone would not necessarily preclude the right to unemployment compensation benefits, they were factors to be considered. (123 So. 2d at 363.) Other factors which the court considered were that the claimants voluntarily chose not to cross the picket line, while other members of their union did so, and that the claimants did not approach the employer for the purpose of resuming work. 123 So. 2d at 363.

Plaintiffs, in their brief, argue that the benefits were paid to them as a result of the clerical workers' strike and that those benefits were not contingent upon their "direct participation in the strike." By this language, we understand that eligibility for strike benefits, while not contingent upon "direct participation," required at least some participation in the strike activity. Strike participation might take several forms, for example, performing kitchen duty to feed those picketing, distributing strike assistance checks, or transporting strikers to State welfare offices to receive food stamps. (See *Kolinske v. Lubbers* (D.C. Cir. 1983), 712 F.2d 471.) The Act makes no distinction between direct or indirect participation. The disqualifying factor is simply "participation."

The problems attendant to assigning qualifying characteristics to conduct for the purpose of determining whether it constitutes participation are apparent. To do so would set the stage for those union members who, though appearing detached and indifferent, have as much of an impact on attaining the goals of the strike as those persons who actually carry the picket signs. Each case must necessarily

turn on its own facts. While we are not persuaded that Corcoran's participation in the strike is a factor, we deem plaintiffs' choice not to cross the picket line, together with their failure to inquire of the availability of work and their receipt of strike benefits for the duration of the labor dispute, to be factors which evidence their participation in the strike.

■ The strike benefit fund is, in a sense, a private insurance arrangement against unemployment due to strikes. (*General Motors Corp. v. Bowling* (1981), 85 Ill. 2d 539, 545-46, 426 N.E.2d 1210.) The purpose of strike benefits is to aid union members engaged in strikes or affected by lockouts. As in the case of some other types of insurance, the union member is required to cooperate with the union in carrying out its strike objectives, in aid of which strike benefits are paid. (*Worcester Telegram Publishing Co. v. Director of Division of Employment Security* (1964), 347 Mass. 505, 514, 198 N.E.2d 892, 898.) The payment of benefits is predicated on the fact that there is a strike.

Plaintiffs would have this court believe that the union paid them strike benefits absent any requirement that they participate in strike activities. However subtle their participation, receipt of the strike benefits enabled the dock workers to support the clerical workers' strike and added strength to their cause. The combined benefits from unemployment insurance and the strike fund would enable the striking members to prolong the work stoppage and delay settlement of the labor dispute.

Contributions into the unemployment insurance fund by employers are compulsory. (Ill. Rev. Stat. 1987, ch. 48, par. 550.) To permit the dock workers to collect both strike benefits and unemployment insurance would effectively place the employer in the position of subsidizing the strike. Such a result would be unsound.

Moreover, to indulge such double dipping would be unfair to employers and employees alike. Employers would be providing benefits to those employees for whom it bears no responsibility for the lack of wages. More importantly, such an allowance creates the risk of depleting these reserve funds, thereby depriving potential beneficiaries, who are involuntarily separated from employment, of the very protection for which the fund was created.

■ Clearly, the legislature intended the Unemployment Insurance Act to safeguard unfortunate individuals from economic insecurity due to involuntary unemployment. (Ill. Rev. Stat. 1987, ch. 48, par. 300.) The participation proviso was intended to alleviate the unfair disqualification of innocent victims of labor disputes who are involun-

tarily separated from employment. The key factor is involuntary unemployment. Thus, it is not disputed that the employees who are separated from their employment due to a strike have the right not to cross the picket line and, even though work is available, this would not abrogate their eligibility for unemployment insurance benefits as long as they were not voluntarily participating in the dispute.

However, we believe that the dock workers here use the participation proviso as a shield for their participation in the strike. The failure to cross the picket line is a factor to be taken into consideration in determining participation. It simply cannot be the only factor upon which disqualification for unemployment insurance is based. "[P]articipation may be shown by other evidence in a case where the *failure to cross a picket line is also in evidence*." (Emphasis added.) *Nestle*, 68 Ill. App. 3d at 20.

The dock workers had the right not to cross the picket line and not be penalized for exercising that right. However, their refusal to cross the line does not require a conclusion of no participation, especially in light of the other indicia of participation. The logical extension of plaintiffs' reasoning is that employees could refuse to cross picket lines, voluntarily engage in a myriad of activities which support the strike, and, under the protection of the participation proviso, disclaim participation in the labor dispute.

Persuaded by the decisional law of our sister States, and our belief that eligibility for strike benefits is contingent upon participation in strike activity, we conclude that plaintiffs' failure to cross the picket line and their receipt of the strike benefits constituted participation in the labor dispute. Plaintiffs were correctly disqualified from receiving unemployment insurance.

For the foregoing reasons, we reverse the judgment of the circuit court.

Reversed.

CERDA, P.J., and RIZZI, J., concur.