INTERNATIONAL UNION OF OPERATING ENGINEERS, Local 148, AFL-CIO, Plaintiff-Appellee, v. THE DEPARTMENT OF EMPLOYMENT SECURITY *et al.*, Defendants-Appellants.

Fifth District   No. 5—01—0903

Opinion filed December 16, 2003.

James E. Ryan, Attorney General, of Chicago (Joel E. Bertocchi, Solicitor General, and Mary Patricia Kerns, Assistant Attorney General, of counsel), for appellant Department of Employment Security.

Stuart I. Cohen and Robert S. Seigel, both of Husch & Eppenberger, L.L.C., of St. Louis, Missouri, for appellant Central Illinois Public Service Company.

Janet E. Young, Greg A. Campbell, and Janine M. Martin, all of Diekemper, Hammond, Shinners, Turcotte & Larrew, P.C., of St. Louis, Missouri, for appellee.

PRESIDING JUSTICE CHAPMAN delivered the opinion of the court:

The defendants, the Illinois Department of Employment Security (Department) and Central Illinois Public Service Company (CIPS), appeal an order of the Franklin County circuit court overturning the Director of Employment Security's decision that members of the plaintiff union were ineligible for unemployment benefits for a period of time that they were out of work due to a labor dispute between CIPS and another union. On appeal, the defendants contend that (1) the union lacked standing to challenge the administrative decision on behalf of its members and (2) the circuit court erred in reversing the Director's determination that the workers were ineligible for benefits. We affirm.

## I. BACKGROUND

Most of CIPS's employees are represented by two unions: the International Union of Operating Engineers, Local 148 (Local 148),

which is the plaintiff herein, and the International Brotherhood of Electrical Workers, Local 702 (Local 702). On June 30, 1992, CIPS's contracts with both unions expired. The parties agreed to a series of contract extensions while negotiations on new contracts continued. On May 20, 1993, with no advanced notice to the unions or the employees, CIPS locked out the union employees. Members of both unions sought unemployment benefits. On June 11, 1993, a claims adjudicator from the Department determined that they were ineligible for benefits because the work stoppage was due to a labor dispute. Both unions appealed.

On June 14, 1993, Local 148 reached an agreement with CIPS on a new contract, which the union members ratified a few days later. Although CIPS ended the lockout of Local 148 employees, effective June 23, 1993, the union members voted to honor the picket lines maintained by Local 702. However, the leadership of Local 148 specifically instructed its members not to participate in Local 702's picketing activities in any way. On August 28, 1993, CIPS and Local 702 reached an agreement on a new contract and the lockout ended.

On November 19, 1993, the National Labor Relations Board (NLRB) filed a complaint and a notice of hearing. Each side alleged that the other had refused to bargain in good faith. The unions contended that CIPS had violated the National Labor Relations Act (NLRA) (29 U.S.C. § 151 et seq. (1988)) by locking out union members in retaliation for "working to rule"—i.e., strictly adhering to safety regulations—and refusing overtime before contract negotiations broke down. CIPS contended that the lockout was designed to promote a resolution to the labor dispute and that the employees.had engaged in a work slowdown.

On January 11 and 12 and May 3 and 4, 1994, the Director's representative, Robert Hayes, conducted hearings in the unions' appeals from the claims adjudicator's determination that their members were ineligible for benefits. The NLRB proceedings were pending simultaneously with the proceedings before Hayes. On January 3, 1995, Hayes issued a report recommending that the claims adjudicator's determination be set aside. He based his recommendation on principles of federal preemption. Hayes noted that the NLRB could find that the lockout violated the NLRA. Hayes reasoned that if the NLRB found that CIPS's lockout of the union members violated the NLRA, section 604 of the Unemployment Insurance Act (820 ILCS 405/604 (West 1992)) would be inapplicable because the NLRA violation would have to be found to be the cause of the work stoppage, rather than a labor dispute. Thus, he did not determine whether the employees fell within the relieving proviso of section 604, which

provides that employees who are out of work due to a work stoppage caused by a labor dispute in which they are not participating are eligible for unemployment insurance if they do not have a direct interest in the dispute and are not the same grade or class as the employees participating in the dispute (820 ILCS 405/604 (West 1992)).

On January 12, 1995, CIPS filed an objection to Hayes's report. On February 16, 1995, the Director issued a decision in which she found that the members of Local 148 had a direct interest in the continuing dispute between CIPS and Local 702 after Local 148 and CIPS had reached an agreement, and the Director ruled that the union members were not eligible for benefits for the entire period from May 20 to August 28, 1993.

On March 22, 1995, Local 148 filed a complaint in the circuit court of Franklin County, seeking a review of the Director's decision pursuant to the Administrative Review Law (735 ILCS 5/3—101 et seq. (West 1994)). The complaint named only Local 148 as a plaintiff and CIPS and the Department as defendants. On April 26, 1995, CIPS and the Department each filed a motion to dismiss the complaint for a lack of subject matter jurisdiction, contending that (1) the complaint failed to join all necessary parties because it did not name the Director as a defendant and (2) Local 148 lacked standing to seek a review of the decision because it was not a party of record in the administrative proceedings nor was it aggrieved by the Director's decision. On April 28, Local 148 filed a motion for leave to file a first amended complaint. In a May 17, 1996, docket entry, the court denied both motions to dismiss and granted the union's motion to file an amended complaint. The same day, Local 148 filed its first amended complaint, adding the Director as a defendant. On June 17, the Department and CIPS jointly filed a motion to reconsider, which the court denied on April 1, 1997.

On October 26, 2001, the circuit court entered an order finding that (1) the members of Local 148 did not have a direct interest in the continuing contract negotiations between CIPS and Local 702 and (2) the members of the two unions were not the same grade or class. The court ruled that the employees were therefore eligible for unemployment benefits for June 22 to August 28. This appeal followed.

## II. ANALYSIS

### A. The Union's Standing

Both CIPS and the Department contend that Local 148 lacked standing to challenge the Director's decision because it was not a party of record aggrieved by the Director's decision. Local 148 responds that (1) it was accorded party status during the administrative proceedings when the claims adjudicator listed it and CIPS as

"interested parties" and (2) it has standing to challenge the decision as a representative of its members, who unquestionably would have standing to seek administrative review individually. In making the latter contention, the union asks us to adopt the federal principle of "associational standing" annunciated by the United States Supreme Court in *Warth v. Seldin*, 422 U.S. 490, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975), and *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 53 L. Ed. 2d 383, 97 S. Ct. 2434 (1977). For the reasons that follow, we conclude that Local 148 has standing to bring the instant action on behalf of its members.

### 1. *Associational Standing*

■ The doctrine of standing exists to ensure that courts decide only actual, specific controversies. Thus, to have standing to bring any action, a party must possess a real interest in the action and its outcome. *Nolan v. Hillard*, 309 Ill. App. 3d 129, 138, 722 N.E.2d 736, 744 (1999). An "interest" in the outcome of the action means more than mere curiosity or concern for the outcome; rather, the party seeking relief must possess a personal claim, status, or right that is capable of being affected. The dispute must touch the legal relations of parties in positions adverse to each other. *Underground Contractors Ass'n v. City of Chicago*, 66 Ill. 2d 371, 376, 362 N.E.2d 298, 301 (1977).

■ Federal courts have held that an organization has standing to sue as a representative of its members if (1) its members would have standing to bring the action individually, (2) the interests sought to be protected are germane to the organization's purpose, and (3) the participation of the individual members is unnecessary. *Hunt*, 432 U.S. at 343, 53 L. Ed. 2d at 394, 97 S. Ct. at 2441. Illinois courts are not required to follow federal rules regarding standing; however, where the state and federal laws of standing differ, state courts tend to be more liberal, finding standing to challenge an administrative action where federal courts would not. *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 491, 524 N.E.2d 561, 574 (1988); *Stanley Magic-Door, Inc. v. City of Chicago*, 74 Ill. App. 3d 595, 597, 393 N.E.2d 535, 537 (1979).

Both CIPS and the Department contend that the Illinois Supreme Court has rejected the doctrine of associational standing. This contention misstates the Illinois Supreme Court's discussion of the doctrine. In *Underground Contractors Ass'n*, the court stated:

"Underground urges, however, that we adopt and apply the [f]ederal court's position which allows an association standing, in limited situations, to maintain suits solely for the benefit of its members. Despite Underground's urging, we need not address ourselves, *at this time*, to the merits underlying the [f]ederal rule,

for \*\*\* Underground's complaint is insufficient to give it standing even under the [f]ederal rule." (Emphasis added.) *Underground Contractors Ass'n*, 66 Ill. 2d at 378, 362 N.E.2d at 302.

It is true, as CIPS and the Department argue, that Illinois courts have not adopted the associational-standing doctrine. See, *e.g., Forsberg v. City of Chicago*, 151 Ill. App. 3d 354, 371, 502 N.E.2d 283, 296-97 (1986) (although recognizing that the Illinois Supreme Court had discussed the federal standard in *Underground Contractors Ass'n*, the court stated that it could find "no indication that Illinois courts have adopted the [f]ederal standard"). However, we have found no case that expressly rejects the doctrine. Rather, the decision to reject or adopt the associational-standing doctrine has remained open, awaiting a proper case. For the reasons that follow, we believe that this is such a case.

The union cannot itself receive unemployment compensation. Thus, the right actually being litigated—the right to receive that benefit—is a right of its members, not of the union itself. That does not mean, however, that the union has no interest of its own "capable of being affected" by the outcome of these proceedings. See *Forsberg*, 151 Ill. App. 3d at 371, 502 N.E.2d at 297 ("Illinois decisions discussing an association's standing to maintain an action \*\*\* on behalf of its members clearly hold that an association's representational capacity *alone* is not enough to give it standing, absent a showing that it has a recognizable interest in the dispute \*\*\* *capable of being affected*" (emphases added)). Indeed, we can think of two interests particular to the union that will be necessarily and directly impacted by the result obtained for its members in this action.

First, unions typically provide strike pay to their members who are unemployed due to a labor dispute and are ineligible for unemployment compensation. See *Boone v. Department of Labor*, 144 Ill. App. 3d 306, 307-08, 495 N.E.2d 66, 66 (1986). The cost of providing strike pay if the union members are erroneously denied unemployment benefits is an economic injury to the union itself. Economic injuries have long been recognized as sufficient to confer standing. *Greer*, 122 Ill. 2d at 493, 524 N.E.2d at 575.

Second, as the California Court of Appeal explained in a closely analogous case, an erroneous denial of benefits where unemployment arises from the relationship of the union and the employer can weaken the collective bargaining process by giving the employer an unfair advantage. *Brotherhood of Teamsters & Auto Truck Drivers, Local No. 70 v. Unemployment Insurance Appeals Board*, 190 Cal. App. 3d 1515, 1522, 236 Cal. Rptr. 78, 83 (1987) (*Teamsters*). There, the union contended that it was locked out by the employer, while the employer

contended that the union members were voluntarily unemployed due to a trade dispute. *Teamsters*, 190 Cal. App. 3d at 1522, 236 Cal. Rptr. at 82-83. In California, unlike Illinois, employees who are out of work due to a lockout are entitled to unemployment insurance benefits. See *Teamsters*, 190 Cal. App. 3d at 1527, 236 Cal. Rptr. at 86, quoting *McKinley v. California Employment Stabilization Comm'n*, 34 Cal. 2d 239, 244-45, 209 P.2d 602, 606 (1949). Here, the union contends that it merely honored another union's picket lines, while the employer and the Department argue that the union had a direct interest in the other union's dispute. We find the situations analogous because in both cases an erroneous ruling could shift a financial burden to the union and its members that they were not required by law to bear, thus giving the employer an advantage in the collective bargaining process to which it is not entitled. We agree with the California court that protecting the integrity of the collective bargaining process itself is "patently a matter of union purpose." *Teamsters*, 190 Cal. App. 3d at 1522, 236 Cal. Rptr. at 83.

We acknowledge that the First District Appellate Court rejected a facially similar argument in *Nolan*; however, we find the situation presented there distinguishable from that presented both here and in the California case. In *Nolan*, a police union filed a declaratory judgment action on behalf of some of its members and challenged a new examination procedure for officers applying to become police sergeants. *Nolan*, 309 Ill. App. 3d at 132-33, 722 N.E.2d at 741. In contending that it had standing to bring the suit on behalf of the officers, the union argued that if it was not allowed to bring the action, it risked losing its position as the collective bargaining agent for the police officers (although it did not explain why). The court rejected this contention, finding the potential injury alleged too remote or speculative. *Nolan*, 309 Ill. App. 3d at 139, 722 N.E.2d at 745. In short, Local 148's interest in the instant action is far more direct than the police union's interest in the challenge it brought in *Nolan*.

We also acknowledge that the California court's task in applying associational standing to the facts before it was easier than ours, in that California courts had previously applied the federal test. See *Teamsters*, 190 Cal. App. 3d at 1521 n.3, 236 Cal. Rptr. at 82 n.3 ("State law on standing for mandate is consistent with federal law."). However, the court also had to address a California statutory requirement that a party have a "beneficial interest" in the litigation in order to have standing. *Teamsters*, 190 Cal. App. 3d at 1524, 236 Cal. Rptr. at 84, citing Cal. Civ. Proc. Code § 1086 (West 1986). The court found that the union's interest in maintaining the integrity of the collective bargaining process by obtaining benefits for its members under

the circumstances presented was a beneficial interest sufficient to confer standing, even while applying the federal associational-standing test. *Teamsters,* 190 Cal. App. 3d at 1524, 236 Cal. Rptr. at 84.

Our conclusion that Local 148 has standing to maintain an action on behalf of its members due to an interest that is necessarily and directly impacted by the outcome of this action is in accord both with the Illinois Supreme Court's *dicta* in *Underground Contractors Ass'n* and with Illinois cases finding standing for similar interests in other contexts. In *Underground Contractors Ass'n,* a trade association seeking to bring an action on behalf of its members cited several cases in which an organization had filed an action on behalf of its members and was allowed to proceed in that capacity. The Illinois Supreme Court rejected the association's contention that these cases were authority for the position it urged, because the issue of standing had not been raised in any of the cited cases. However, the court also pointed out that in two of the cited cases, the organizations themselves had interests involved in the litigation. *Underground Contractors Ass'n,* 66 Ill. 2d at 376, 362 N.E.2d at 301. In *Antioch Community High School Teachers' Ass'n v. Board of Education of Antioch Community High School District No. 117,* 2 Ill. App. 3d 504, 505, 275 N.E.2d 683, 684 (1971), one of the cases cited by the trade association, a teachers' association sought a declaratory judgment that a school board is not prohibited from granting its employees personal leave. The *Underground Contractors Ass'n* court distinguished *Antioch Community High School Teachers' Ass'n* from the facts before it, noting, "In *Antioch* \*\*\* the association as well as its members had an interest in the controversy, for the association's right and ability to negotiate with the board of education concerning paid personal leaves was directly involved." *Underground Contractors Ass'n,* 66 Ill. 2d at 376-77, 362 N.E.2d at 301. This was so despite the fact that the teachers' association could not itself be granted personal leave. Although the court's statements are *dicta,* they evince a willingness to adopt the doctrine of associational standing in a case where the association seeking to represent its members has an interest that might be impacted by the litigation in a similar manner.

We find additional support for the proposition that a legally cognizable interest that is necessarily and directly impacted by the outcome of litigation is sufficient to confer standing in *Chicago Park District v. City of Chicago,* 127 Ill. App. 3d 215, 468 N.E.2d 1261 (1984), *aff'd on other grounds,* 111 Ill. 2d 7, 448 N.E.2d 968 (1986). There, the court found that the Chicago Park District had standing to challenge the validity of a boat mooring tax in spite of the fact that it did not own boats or pay mooring fees, because the mooring tax could interfere

with its contracts and regulatory functions and cause a loss of revenue by driving away boaters. *Chicago Park District*, 127 Ill. App. 3d 215, 468 N.E.2d 1261. We note that the park district was challenging the mooring tax on its own behalf and that, therefore, the case is not directly analogous to the case at bar. Nevertheless, we find it applicable because the park district's interest in the suit was the *type* of interest the union seeks to protect in the instant litigation. The park district's right was not being litigated but was necessarily and directly impacted by the outcome of the litigation.

Significantly, organizations able to meet the associational-standing test often have an interest of their own in the litigation. In *Hunt*, for instance, the Washington Apple Advertising Commission itself had an interest in the litigation due to the fact that the assessments levied on Washington State apple growers to finance the commission were calculated based on the volume of apples packaged and sold as "Washington Apples," which could be reduced by the North Carolina statute being challenged. *Hunt*, 432 U.S. at 345, 53 L. Ed. 2d at 395, 97 S. Ct. at 2442. Similarly, as we stated earlier, the *Teamsters* court found that the union's interest in protecting the integrity of the collective bargaining process was sufficient to meet the state's beneficial-interest requirement for standing. The court found that the same interest met the associational-standing requirement that an organization seek to protect an interest that is germane to its purpose. *Teamsters*, 190 Cal. App. 3d at 1522, 236 Cal. Rptr. at 83. In fact, while associational standing may confer standing on parties who might have interests in the litigation insufficient to give them standing as individuals, the requirement that the interest sought to be protected be germane to the organization's purpose will necessarily eliminate parties with no significant interest in the outcome. Thus, we believe that the requirements of the associational-standing test are sufficient in themselves to eliminate from the dockets of our courts cases that are not truly adversarial in nature, which is the purpose of standing. See *Greer*, 122 Ill. 2d at 488, 524 N.E.2d at 572.

■ Having concluded that applying the test for associational standing is appropriate in this case, we now determine whether Local 148 meets its requirements. Associational standing requires that (1) at least some of the members would have standing to bring the action individually, (2) the interest at stake is germane to the organization's purpose, and (3) neither the claim asserted nor the relief sought requires the participation of the individual members. *Hunt*, 432 U.S. at 343, 53 L. Ed. 2d at 394, 97 S. Ct. at 2441. Neither CIPS nor the Department contends that the union members would lack standing to bring this action individually. We agree with the California appellate

court that protecting the integrity of the collective bargaining process is germane to the purpose of a union. See *Teamsters*, 190 Cal. App. 3d at 1522, 236 Cal. Rptr. at 82-83. Both the findings of the Director and the arguments of all three parties on appeal focus on the relationship of the union and the employer; they do not involve the actions of individual union members. Thus, the participation of the individual members in the litigation is not required. We conclude that Local 148 has standing to bring the administrative review action on behalf of its members.

## 2. *Party Status*

CIPS and the Department next contend that Local 148 lacked standing to bring the administrative review action because it was not a party of record in the administrative proceedings. The union contends that it was accorded party status during the administrative proceedings and that this requirement need not be met in any case because it has standing to sue in a purely representative capacity.

■ Generally, only a party who was *both* of record in the administrative proceedings *and* adversely affected by the final administrative decision has standing to seek administrative review. *Williams v. Department of Labor*, 76 Ill. 2d 72, 77, 389 N.E.2d 1177, 1179 (1979). The reason for this additional requirement for standing in petitions for administrative review is that review is limited to the administrative record. Allowing a party that did not participate in administrative proceedings to obtain judicial review would require the circuit court to accept as true any allegations raised by such a party, because the court cannot hear additional evidence. *Lake County Contractors Ass'n v. Pollution Control Board*, 54 Ill. 2d 16, 20-21, 294 N.E.2d 259, 262 (1973).

■ This requirement is not, however, an inflexible rule. In *Collins v. Industrial Comm'n*, 12 Ill. 2d 200, 145 N.E.2d 622 (1957), attorneys representing a claimant in a workers' compensation proceeding before the Industrial Commission sought judicial review of the Industrial Commission's order setting their fees. *Collins*, 12 Ill. 2d at 200, 145 N.E.2d at 623. In response to the argument that the attorneys were not parties of record to the workers' compensation hearings, the Illinois Supreme Court stated:

> "[W]e think that the attorneys were parties to the supplemental hearing at which their fees were determined. They were so treated by the [Industrial] Commission, which formally named them as respondents in giving them notice of that hearing. At the hearing[,] the attorneys offered evidence and were interrogated." *Collins*, 12 Ill. 2d at 203, 145 N.E.2d at 624.

Similarly, Local 148 was listed as an "interested party" by the claims adjudicator, received notice of hearings, and participated fully at all stages of the proceedings.

The cases cited by the Department do not require us to reach a different conclusion. In *Robinson v. Regional Board of School Trustees*, 130 Ill. App. 3d 509, 512, 474 N.E.2d 708, 710 (1985), this court held that a circuit court properly dismissed an administrative review petition as untimely. In rejecting the plaintiff's argument that we should create an exception to the time limit for filing because she was an "affected party" who had never been served with a copy of the administrative decision, we noted that the plaintiff did not file a written appearance at the administrative hearing or have an attorney appear for her. We stated, "Indeed, we find nothing in the record to indicate that plaintiff was anything more than a passive spectator at the administrative hearing." *Robinson*, 130 Ill. App. 3d at 513, 474 N.E.2d at 711. The Fourth District Appellate Court considered and rejected a similar argument in *Kemp-Golden v. Department of Children & Family Services*, 281 Ill. App. 3d 869, 667 N.E.2d 688 (1996). There, a mother challenged a decision to expunge a report of child abuse against the child's father after it had been determined that the report was unfounded. *Kemp-Golden*, 281 Ill. App. 3d at 872, 667 N.E.2d at 691. The mother contended that her participation in the proceedings amounted to "*de facto* intervention to which no one objected." *Kemp-Golden*, 281 Ill. App. 3d at 877, 667 N.E.2d at 693. The court found that her role in the proceedings was more akin to that of a complaining witness in a criminal trial, however, and observed that a complaining witness has no right to appeal the outcome of a criminal trial. *Kemp-Golden*, 281 Ill. App. 3d at 877, 667 N.E.2d at 694. By contrast, Local 148 participated in these proceedings in the exact capacity it seeks to bring this administrative review action. We therefore find both *Robinson* and *Kemp-Golden* distinguishable.

In *Williams*, an unemployment insurance claimant challenged the authority of the administrative agency to limit the fee his attorney could charge for representing him in his unemployment insurance claim. *Williams*, 76 Ill. 2d at 76, 389 N.E.2d at 1179. Contrary to the Department's contention at oral argument, the Illinois Supreme Court did not hold that the claimant lacked standing to bring the action on behalf of his attorney because the attorney was not a party of record. Rather, the court held that the claimant lacked standing because he was not aggrieved by a decision to limit the fees he had to pay. *Williams*, 76 Ill. 2d at 78, 389 N.E.2d at 1180. Indeed, the court noted that the nonparty attorney would have had standing to bring the action on his own behalf. *Williams*, 76 Ill. 2d at 78, 389 N.E.2d at 1180, citing *Collins*, 12 Ill. 2d at 203, 145 N.E.2d at 624. In the remaining cases cited by the Department, the issue was whether the party was aggrieved, not whether it was a party of record. *222 East Chestnut*

*Street Corp. v. Board of Appeals of the City of Chicago*, 10 Ill. 2d 132, 134, 139 N.E.2d 218, 219-20 (1956); *Winston v. Zoning Board of Appeals of Peoria County*, 407 Ill. 588, 594, 95 N.E.2d 864, 868-69 (1950). We thus find these cases inapposite. We conclude that Local 148 has standing to bring this action.

## B. Eligibility for Unemployment Compensation

### 1. *Standard of Review*

■ On administrative review, we review the final administrative decision, which in this case is the Director's determination that the members of Local 148 were not entitled to unemployment benefits. *XL Disposal Corp. v. Zehnder*, 304 Ill. App. 3d 202, 207, 709 N.E.2d 293, 297 (1999). We review findings of fact to determine whether they are against the manifest weight of the evidence. The Director's interpretations of statutes, however, are not entitled to the same deference we accord her findings of fact. *Nestle Co. v. Johnson*, 68 Ill. App. 3d 17, 20, 385 N.E.2d 793, 795 (1979). Further, we are not required to accept the Department's characterization of a particular conclusion as either a finding of fact or an interpretation of law. *Berry v. Blackard Construction Co.*, 13 Ill. App. 3d 768, 772, 300 N.E.2d 627, 630 (1973). The Director's conclusion that Local 148 had an interest in Local 702's labor dispute with CIPS after it had concluded its own negotiations was an interpretation of section 604 of the Unemployment Insurance Act (820 ILCS 405/604 (West 2000)) as applied to undisputed facts. Thus, we need not accord it the same deference we would give a finding of fact. See *Bridgestone/Firestone, Inc. v. Doherty*, 305 Ill. App. 3d 141, 147, 711 N.E.2d 799, 804 (1999) ("The legal effect of undisputed facts is a question of law," which we review *de novo*).

### 2. *Direct Interest in the Dispute*

CIPS and the Department contend that the Director correctly determined that Local 148 continued to have a direct interest in Local 702's dispute with CIPS. They each contend that Local 148's members had an enforceable contractual right to any increase in the health insurance premiums paid by CIPS that Local 702 had negotiated. Local 148, by contrast, argues that the proximity of the results of Local 702's contract negotiations was not close enough to support the contention that its members had a direct interest in the outcome. We agree with the union.

■ Employees who are unemployed due to a work stoppage caused by a labor dispute are ineligible for unemployment benefits due to Illinois's policy of maintaining neutrality in such disputes. *Local 7—641,*

*Oil, Chemical & Atomic Workers International Union v. Department of Labor*, 96 Ill. 2d 94, 98, 449 N.E.2d 134, 136 (1983). The relieving proviso exists to protect workers who are unemployed due to a labor dispute in which they are not involved from being unfairly left without benefits because the strike or lockout interferes in some way with their ability to perform their jobs—for instance, where a work stoppage by those involved in the labor dispute leaves them with no work to do (see, *e.g., General Motors Corp. v. Bowling*, 85 Ill. 2d 539, 541, 426 N.E.2d 1210, 1211 (1981) (shop clerks were laid off when production workers' strike caused a shortage of work)) or where they are prevented from crossing the picket lines of those who are involved (see, *e.g., Outboard, Marine & Manufacturing Co., Johnson Motors Division v. Gordon*, 403 Ill. 523, 538-39, 87 N.E.2d 610, 618 (1949) (office workers were unable to enter their workplace when striking factory workers kept the gates locked)). See *Gordon*, 403 Ill. at 536, 87 N.E.2d at 617 ("the legislature intended to provide for the innocent victims of a labor dispute"). Honoring the picket line of another union does not automatically disqualify employees from receiving unemployment benefits; thus, those who are unemployed because of another union's labor dispute may fall within the relieving proviso. *Nestle Co.*, 68 Ill. App. 3d at 20, 385 N.E.2d at 795-96.

■ The no-direct-interest requirement of the relieving proviso is designed to prevent one union from settling and receiving unemployment benefits while allowing another union to essentially negotiate a benefit on behalf of the members of both unions. See *Gordon*, 403 Ill. at 536, 87 N.E.2d at 617 (the statute was meant to exclude "those who attempted to gain by conduct which caused their unemployment"). Illinois courts have consistently held that where one union has a legally enforceable right to a benefit at issue in another union's dispute, the first union has a direct interest in the outcome of the dispute. By contrast, where the union has a mere expectancy in the outcome of another union's dispute, such as where the employer historically patterns its collective bargaining agreements with each of its unions after each other, our courts have not found a direct interest. *General Motors Corp.*, 85 Ill. 2d at 542, 426 N.E.2d at 1211; *Owens-Illinois, Inc. v. Bowling*, 99 Ill. App. 3d 1117, 1127-28, 429 N.E.2d 172, 180 (1981), *aff'd as modified on other grounds*, 95 Ill. 2d 397, 447 N.E.2d 1324 (1983); *Nestle Co.*, 68 Ill. App. 3d at 20, 385 N.E.2d at 796.

■ The situation presented by the instant case does not fit squarely within either of these categories, however. Local 702 had a choice to either leave Salaried Plan B—in which case Local 148 would *not* have a legally enforceable right to any increase that Local 702 negotiated—or remain in the plan—in which case Local 148 *would* have a

right to the increase. Presumably, Local 702 would choose whichever option afforded its members the greatest benefits. If it were able to negotiate a better premium payment by leaving Salaried Plan B, it would not be in Local 148's interest for Local 702 to succeed in getting the best possible deal. In short, the interests of the two unions did not directly coincide because the fortunes of Local 148 did not necessarily rise or fall with those of Local 702. Viewing this divergence of interests in light of the policy behind the requirement, we conclude that Local 148 did not have a direct interest in the outcome of the labor dispute. See *Gordon*, 403 Ill. at 536-37, 87 N.E.2d at 617 ("A proximity of conduct aiding or abetting the strikers or proximity of result to be gained from the dispute were meant to be the measuring factors.").

### 3. *Same Grade or Class*

CIPS contends that the circuit court erred in concluding that members of Local 148 were not in the same grade or class as members of Local 702. The Department argues that the circuit court exceeded its jurisdiction in making this determination because the Director made no findings regarding the members' grade or class. The union contends that the trial court's determination was correct and does not address the Department's jurisdictional argument.

We find distinguishable or inapposite the cases the Department cites for the proposition that the circuit court exceeded its jurisdiction. In each, either the circuit court exceeded its jurisdiction by reaching the merits when the administrative agency had dismissed the claim without making any determination at all on the merits (*Rosecky v. Department of Public Aid*, 157 Ill. App. 3d 608, 611, 511 N.E.2d 167, 169 (1987)) or the court found it necessary to remand the matter to the administrative agency for further evidentiary proceedings because the relevant determination could not be made without further evidence (*Illinois Nurses Ass'n v. State Labor Relations Board*, 156 Ill. App. 3d 841, 843, 509 N.E.2d 1307, 1309 (1987) (noting that the Administrative Review Law *permits* a remand for that purpose)). Here, by contrast, the Director's representative conducted four days of hearings, and the parties submitted voluminous additional evidence. The Director and the Director's representative each considered written arguments of the parties. They both made rulings on the merits. The determination that the circuit court had jurisdiction to review was the Director's determination that the members of Local 148 were ineligible for benefits. The fact that her interpretation of the statute did not require her to reach a specific conclusion regarding whether members of the two unions belong to the same grade or class should not deprive them of relief. See *Amico v. Board of Review, Division of Employment*

*Security, Department of Labor & Industry*, 49 N.J. 159, 163, 228 A.2d 865, 867 (1967) ("An appeal from a final judgment brings up every relevant issue urged before the agency or court, whether passed upon or not"). For the reasons that follow, we find that the circuit court could properly make that determination as a matter of law from uncontroverted evidence appearing in the record.

There is a dearth of case law addressing the requirement that workers must be of a different grade or class than those participating in a labor dispute in order to fall within the purview of the relieving proviso. Courts that have addressed this requirement in other jurisdictions have focused *either* on membership in different unions *or* on the nature of the work performed by the employees. *Bethlehem Steel Co. v. Board of Appeals, Department of Employment Security*, 219 Md. 146, 151-52, 148 A.2d 403, 406 (1959). CIPS's contention that the members of both unions were in the same grade or class focuses on the nature of their work, while the union's arguments focus on the undisputed evidence that the employees were represented by two different unions and worked under different collective bargaining contracts. Illinois courts have addressed both types of arguments. See, *e.g., Shell Oil Co. v. Cummins*, 7 Ill. 2d 329, 336-38, 131 N.E.2d 64, 68-69 (1955) (considering membership in 12 separate unions); *Gordon*, 403 Ill. at 540-42, 87 N.E.2d at 619-20 (considering both union membership and the nature of the work performed); *Boone*, 144 Ill. App. 3d at 309-10, 495 N.E.2d at 68 (considering the nature of the work performed).

We find little guidance for determining whether the nature of the work performed by two different groups of employees makes them of "the same grade or class" from those Illinois cases that have considered the requirement from this angle. In *Boone*, this court found that a newly hired employee who was not yet eligible for union membership when a strike occurred was in the same grade or class as the striking union members because there was no evidence that "his status or duties" were at all different from those of the employees who had already joined the union. *Boone*, 144 Ill. App. 3d at 309, 495 N.E.2d at 68. In *Gordon*, the Illinois Supreme Court found that office workers were not in the same grade or class as striking factory workers, due *in part* to the different nature of their work. *Gordon*, 403 Ill. at 541, 87 N.E.2d at 619. We find it significant that in neither of these cases was the similarity or difference in the work performed by the employees dispositive. In *Boone*, we observed, "The mere fact [that the] plaintiff was not a union member *at the time of the labor dispute* did not preclude him from belonging to the same grade or class as the union members." (Emphasis added.) *Boone*, 144 Ill. App. 3d at 309-10, 495 N.E.2d at 68. We also noted that he joined the union when he

became eligible for membership. *Boone*, 144 Ill. App. 3d at 308, 495 N.E.2d at 66-67. In *Gordon*, the Illinois Supreme Court addressed the membership of the office workers and factory workers in separate unions as an indicator of grade or class as well. *Gordon*, 403 Ill. at 541-42, 87 N.E.2d at 619-20.

CIPS points out that the operating engineers represented by Local 148 and the electrical workers represented by Local 702 all performed maintenance, production, and repair work. In *Boone*, we pointed out that the plaintiff and the striking union members were all "maintenance and production" workers. Although we found unnecessary a discussion of the type of work that might be included in that category, it is obvious that the basis of our holding was the fact that the only difference between the plaintiff and the union members was his status as a new hire ineligible for immediate union membership. We could infer from the facts that he was in fact in the grade or class of worker represented by the union involved. In the instant case, where there are two unions involved, we cannot make such an inference. We think "production, maintenance, and repair" is too broad a category to require a finding that the members of the two unions are in the same grade or class. Indeed, it may well describe all the work performed at the CIPS facilities affected by the lockouts. Moreover, we note that each union represents people with widely varying types of job duties. For example, at the Grand Tower Power Station, Local 702 represents electricians, gas utility workers, meter readers, and even a janitor and a cashier, while Local 148 represents a storeroom clerk and a maintenance and repair worker. Significantly, the Grand Tower Power Station is the only facility at which employees are represented by both unions.

■ Given the lack of direction provided by the Illinois cases that discuss the nature of the work performed and the emphasis Illinois courts have placed on membership in different unions, we find that the circuit court could properly conclude that members of the two unions are not in the same grade or class based on their representation by separate unions under separate collective bargaining agreements. The fact that the unions acted in concert in negotiations with CIPS does not change this result. See *Shell Oil Co.*, 7 Ill. 2d at 337-38, 131 N.E.2d at 68-69 (emphasizing the autonomy of the 12 unions that typically negotiated jointly to determine whether to accept the agreement ratified by the other unions); *Gordon*, 403 Ill. at 541, 87 N.E.2d at 619 (noting that the office workers had no right to vote on the factory workers' decision to strike). We conclude that the circuit court correctly determined that the union members were eligible for unemployment compensation.

## III. CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court reversing the decision of the Director of Employment Security.

Affirmed.

MAAG and KUEHN, JJ., concur.