(No. 97695.—

INTERNATIONAL UNION OF OPERATING ENGI-
NEERS, LOCAL 148, AFL-CIO, Appellee, v. THE
ILLINOIS DEPARTMENT OF EMPLOYMENT
SECURITY *et al.*, Appellants.

*Opinion filed March 24, 2005.—Rehearing denied May 23, 2005.*

38

KARMEIER, J., took no part.

THOMAS, J., joined by GARMAN, J., specially concurring.
KILBRIDE, J., concurring in part and dissenting in part.

Stuart I. Cohen and Mark G. Arnold, of Husch & Eppenberger, L.L.C., of St. Louis, Missouri, for appellant Central Illinois Public Service Company.

Lisa Madigan, Attorney General, of Springfield (Gary Feinerman, Solicitor General, and Mary Patricia Kerns, Assistant Attorney General, of Chicago, of counsel), for appellant Illinois Department of Employment Security.

Janet E. Young, Janine M. Martin and Greg A. Campbell, of Diekemper, Hammond, Shinners, Turcotte & Larrew, P.C., of St. Louis, Missouri, for appellee.

JUSTICE FREEMAN delivered the opinion of the court:

At issue in this appeal is whether the members of the International Union of Operating Engineers, Local 148, AFL-CIO, are entitled to unemployment compensation benefits for the period of time between June 22, 1993, and August 28, 1993. The appellate court ruled that the members of Local 148 were eligible for benefits. 345 Ill. App. 3d 382. The Illinois Department of Employment Security (Department), and the employer, Central Illinois Public Service Company (CIPS), filed a petition for leave to appeal. 177 Ill. 2d R. 315. We granted the petition, and now reverse.

## BACKGROUND

CIPS is a public utility furnishing electricity and natural gas to residential and commercial customers in

portions of central and southern Illinois. CIPS operates three natural gas distribution divisions designated as the Eastern, Southern and Western divisions. CIPS also operates five electricity power generating plants known as the Newton, Coffeen, Meredosia, Hutsonville, and Grand Tower stations. Local 148 (hereinafter, Engineers' Union) represents approximately 549 production and maintenance employees at the Coffeen, Meredosia, Hutsonville, and Grand Tower facilities. The International Brotherhood of Electrical Workers, Local 702, represents approximately 950 production, maintenance and operation employees at the Newton power station and the Eastern, Southern and Western divisions. Local 702 also represents 12 workers in the production department at the Grand Tower station, with these employees included in the Southern division bargaining unit. Each power station and division is covered by a separate collective-bargaining agreement.

On June 30, 1992, the collective-bargaining agreements between CIPS and the unions expired. CIPS and the unions agreed to a series of contract extensions. In March 1993, CIPS presented "final" contract proposals to the unions, which both unions rejected. CIPS management discussed the possibility of a lockout at several meetings, the earliest being a meeting on April 15, 1993. At the expiration of the last contract extension on April 24, 1993, union members began to adhere strictly to company safety and other rules, and to refuse voluntary overtime work. Although CIPS and the unions continued to meet, holding negotiation sessions on May 14, 17, and 18, 1993, CIPS made a decision on or about May 7, 1993, to lock out its employees. At 4 a.m. on May 20, 1993, CIPS instituted a lockout of all members of the two unions.

The negotiations between CIPS and the unions continued during the lockout. On June 14, 1993, CIPS

and Engineers' Union reached a tentative agreement on the terms of a new contract. The members of Engineers' Union ratified the contract on June 17 and 18, 1993, and CIPS and Engineers' Union signed the contract on June 21, 1993. CIPS ended the lockout of the members of Engineers' Union on June 22, 1993. Although eligible to return to work, the members of Engineers' Union respected the picket lines established by the members of Local 702 and stayed off the job. On August 25, 1993, CIPS announced that it was ending the lockout of the members of Local 702, even though CIPS and Local 702 had not reached agreement on new contracts. The members of both unions returned to work on August 28, 1993. Negotiations continued between CIPS and Local 702, and in January 1994, CIPS and Local 702 reached agreement on new contracts.

During the lockout, members of both unions applied for unemployment compensation benefits. On June 11, 1993, a Department claims adjudicator determined that the union members were not eligible for benefits because their total or partial unemployment was due to a stoppage of work which was in turn caused by a labor dispute at the facility at which they were last employed. The unions appealed the claims adjudicator's decision. On August 18, 1993, the Director's representative notified all union members that the unions proposed to represent them in a consolidated appeal, and allowed each member 10 days to object to consolidation and/or representation by union attorneys. Sixty-six union members chose to be represented by a nonunion attorney. Thirteen additional union members objected to both consolidation of the appeals and representation by union attorneys.

Also in August 1993, Engineers' Union moved to sever from the proceedings issues pertaining to the eligibility of its members to receive benefits starting June 21, 1993, the date CIPS and Engineers' Union entered

into the new contract. Engineers' Union sought an administrative determination that its members were eligible for unemployment compensation beginning on June 21, 1993. CIPS objected to the motion to sever, arguing that the unemployment of members of Engineers' Union and Local 702 arose out of the same work stoppage caused by the same labor dispute involving the same employer. The Director's representative denied the motion to sever and consolidated the appeals because the issues to be decided involved common questions of fact and law.

On January 11 and 12 and May 3 and 4, 1994, the Director's representative conducted a hearing on the appeals from the claims adjudicator's decision. Subsequently, on January 3, 1995, the Director's representative recommended that the determination of the claims adjudicator be set aside, and that the union members be found eligible for benefits for the period from May 20, 1993, through August 28, 1993, subject to recoupment. The Director's representative based his recommendations on principles of federal preemption. The unions had filed claims with the National Labor Relations Board (NLRB), contending that CIPS had violated the National Labor Relations Act (29 U.S.C. § 151 *et seq.* (1988)) by implementing the lockout in retaliation for union members "working to rule." Responding that the union members had participated in a work slowdown, CIPS argued that the lockout was designed to promote an end to the labor dispute. The Director's representative noted that the NLRB could yet determine that the lockout violated the NLRA, in which case the lockout would be the cause of the work stoppage rather than a labor dispute. The union members would not be ineligible for benefits because section 604 of the Unemployment Insurance Act (820 ILCS 405/604 (West 1992)) only applies where the work stoppage is due to a labor dispute.

On February 16, 1995, the Director rejected the recommended decision, finding the union members ineligible for benefits for the entire period from May 20, 1993, through August 28, 1993. According to the Director, the relevant question under section 604, whether the work stoppage was due to a labor dispute, was entirely different from the issue before the NLRB, whether CIPS acted in good faith in implementing a lockout in response to concerted union activity. Having found that federal law did not preempt a determination by the Department regarding eligibility for unemployment benefits, the Director went on to rule that the union members were unemployed due to a work stoppage that resulted from a labor dispute. Further, members of Engineers' Union had a direct interest in the ongoing labor dispute between CIPS and Local 702, and were not eligible for benefits between June 22, 1993, and August 28, 1993.

On March 22, 1995, Engineers' Union filed a complaint in the circuit court of Franklin County seeking review of the Director's decision pursuant to the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 1994)). The complaint named the Department and CIPS as defendants and necessary parties to the action. The Department and CIPS both filed motions to dismiss the complaint for lack of subject matter jurisdiction. The Department and CIPS contended that the complaint was defective because it failed to name the Director as a defendant, although the Director was a necessary party to the action. Additionally, the Department and CIPS maintained that Engineers' Union lacked standing to seek review of the Director's decision because Engineers' Union was not a party of record in the administrative proceedings and was not aggrieved by the Director's decision. On May 17, 1996, the circuit court denied the motions to dismiss and granted Engineers' Union leave to file an amended complaint naming the Director as a

defendant. The circuit court also denied defendants' joint motion to reconsider.

On October 26, 2001, the circuit court set aside the Director's decision. The court found that the members of Engineers' Union did not have a direct interest in the labor dispute between CIPS and Local 702 after June 22, 1993. The court also found that the members of Engineers' Union were not of the same grade or class as the members of Local 702. The court concluded that the members of Engineers' Union were eligible for benefits after June 22, 1993, the date CIPS ended its lockout against them.

The Department and CIPS appealed. The appellate court affirmed the decision of the circuit court. 345 Ill. App. 3d 382. The court ruled that Engineers' Union had standing to bring an action on behalf of its members. 345 Ill. App. 3d at 387-95. On the merits, the court held that the members of Engineers' Union did not have a direct interest in the dispute between Local 702 and CIPS. 345 Ill. App. 3d at 395-96. The court also held that members of Engineers' Union were not of the same grade or class as the members of Local 702. 345 Ill. App. 3d at 396-98. Like the circuit court, the appellate court concluded that the members of Engineers' Union were eligible for benefits after June 22, 1993. This appeal followed.

ANALYSIS

I. Union's Standing

A threshold issue in this appeal is whether Engineers' Union lacked standing to appeal the decision of the Director denying benefits to the members of the union. The Department and CIPS moved for dismissal pursuant to section 2—619 of the Code of Civil Procedure (735 ILCS 5/2—619 (West 2000)). The circuit court denied the motions to dismiss.

Section 2—619 of the Code of Civil Procedure pro-

vides for the involuntary dismissal of a cause of action based on certain defects or defenses. One of the enumerated grounds for a section 2—619 dismissal is that the claim is barred by affirmative matter which avoids the legal effect of or defeats the claim. 735 ILCS 5/2—619(a)(9) (West 2000). Affirmative matter is "something in the nature of a defense that negates the cause of action completely or refutes crucial conclusions of law or conclusions of material fact contained in or inferred from the complaint." *In re Estate of Schlenker*, 209 Ill. 2d 456, 461 (2004); *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 486 (1994). "Our precedent makes clear that lack of standing qualifies as 'affirmative matter' within the meaning of section 2—619(a)(9) and may properly be challenged through a motion to dismiss under that statute." *Schlenker*, 209 Ill. 2d at 461, citing *Glisson v. City of Marion*, 188 Ill. 2d 211, 220 (1999).

Under Illinois law, a plaintiff need not allege facts establishing standing. *Wexler v. Wirtz Corp.*, 211 Ill. 2d 18, 22 (2004); *Chicago Teachers Union, Local 1 v. Board of Education of the City of Chicago*, 189 Ill. 2d 200, 206 (2000). Rather, it is the defendant's burden to plead and prove lack of standing. *Chicago Teachers Union*, 189 Ill. 2d at 206; *Greer v. Illinois Housing Development Authority*, 122 Ill. 2d 462, 494 (1988). Where standing is challenged by way of a motion to dismiss, a court must accept as true all well-pleaded facts in the plaintiff's complaint and all inferences that can reasonably be drawn in the plaintiff's favor. *Schlenker*, 209 Ill. 2d at 461. A court's disposition of a section 2—619 motion on lack of standing presents a question of law which we review *de novo*. *Wexler*, 211 Ill. 2d at 23; *Schlenker*, 209 Ill. 2d at 461; *Chicago Teachers Union*, 189 Ill. 2d at 206.

The Department and CIPS contend that Engineers' Union lacked standing to appeal the decision of the Director because Engineers' Union neither was a party to the

proceedings in the Illinois Department of Employment Security nor suffered injury as a result of the Director's decision denying benefits to the members of the union. The circuit court and appellate court disagreed. Citing the doctrine of associational standing, as enunciated by the Supreme Court, the appellate court held that Engineers' Union could prosecute an appeal from the Director's decision on behalf of its members. The appellate court also held that Engineers' Union was a party in the administrative agency proceedings because Engineers' Union was listed as an "interested party" by the claims adjudicator, received notice of hearings, and participated fully at all stages of the proceedings. We consider first the applicability of the doctrine of associational standing.

In *Warth v. Seldin*, 422 U.S. 490, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975), the Supreme Court considered the standing of various organizations and individuals to bring an action challenging a town's zoning ordinance they claimed effectively excluded persons of low and moderate income from living in the town. Initially the Court observed: "There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy. Moreover, in attempting to secure relief from injury to itself the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational ties." *Warth*, 422 U.S. at 511, 45 L. Ed. 2d at 362, 95 S. Ct. at 2211. The organizations at issue not having sustained direct injury, the Court next considered the organizations' standing to bring an action on behalf of their members. The Court held that an association may have standing to represent its members:

> "The association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make

out a justiciable case had the members themselves brought suit. [Citation.] So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction." *Warth*, 422 U.S. at 511, 45 L. Ed. 2d at 362, 95 S. Ct. at 2211-12.

Later in *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 53 L. Ed. 2d 383, 97 S. Ct. 2434 (1977), the Court further defined the test applicable to an association seeking to represent the interests of its members in legal proceedings. The Court explained:

"[A]n association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343, 53 L. Ed. 2d at 394, 97 S. Ct. at 2441.

Applying this tripartite test, the Court concluded that the Washington State Apple Advertising Commission had the requisite standing.

In *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 134 L. Ed. 2d 758, 116 S. Ct. 1529 (1996), the Court differentiated between the three prongs of the *Hunt* associational standing test. The Court noted that the first prong is a constitutional necessity for an association's representative suit and the most direct answer to the federal cases or controversies requirements of injury in fact, causal connection to the defendant's conduct, and redressability. *Brown Group*, 517 U.S. at 555, 134 L. Ed. 2d at 769, 116 S. Ct. at 1535. The second prong is, "at the least, complementary to the first, for its demand that an association plaintiff be organized for a purpose germane to

the subject of its member's claim raises an assurance that the association's litigators will themselves have a stake in the resolution of the dispute, and thus be in a position to serve as the defendant's natural adversary." *Brown Group*, 517 U.S. at 555-56, 134 L. Ed. 2d at 769, 116 S. Ct. at 1535-36. In contrast, the third prong is "judicially fashioned and prudentially imposed" (*Brown Group*, 517 U.S. at 558, 134 L. Ed. 2d at 771, 116 S. Ct. at 1537) and "is best seen as focusing on matters of administrative convenience and efficiency, not on elements of a case or controversy within the meaning of the Constitution." *Brown Group*, 517 U.S. at 557, 134 L. Ed. 2d at 770, 116 S. Ct. at 1536. Because the third prong is prudential in nature and not a constitutional necessity, the legislature may remove it by statute.

The doctrine of associational standing is firmly established in federal law. See *Brown Group*, 517 U.S. 544, 134 L. Ed. 2d 758, 116 S. Ct. 1529; *International Union, United Automobile, Aerospace, & Agricultural Implement Workers of America v. Brock*, 477 U.S. 274, 91 L. Ed. 2d 228, 106 S. Ct. 2523 (1986). The courts of sister jurisdictions have also recognized the doctrine and have applied the *Hunt* tripartite test to determine the standing of associations to represent their members in legal proceedings. See *Alaskans for a Common Language, Inc. v. Kritz*, 3 P.3d 906 (Alaska 2000); *Brotherhood of Teamsters & Auto Truck Drivers, Local No. 70 v. California Unemployment Insurance Appeals Board*, 190 Cal. App. 3d 1515, 236 Cal. Rptr. 78 (1987); *Colorado Manufactured Housing Ass'n v. Pueblo County*, 857 P.2d 507 (Colo. App. 1993); *Connecticut Ass'n of Not-For-Profit Providers for the Aging v. Department of Social Services*, 244 Conn. 378, 709 A.2d 1116 (1998); *Oceanport Industries, Inc. v. Wilmington Stevedores, Inc.*, 636 A.2d 892 (Del. 1994); *NAACP, Inc. v. Florida Board of Regents*, 863 So. 2d 294 (Fla. 2003); *Aldridge v. Georgia Hospital-*

*ity & Travel Ass'n*, 251 Ga. 234, 304 S.E.2d 708 (1983); *Aged Hawaiians v. Hawaiian Homes Comm'n*, 78 Haw. 192, 891 P.2d 279 (1995); *Selkirk-Priest Basin Ass'n v. State ex rel. Andrus*, 127 Idaho 239, 899 P.2d 949 (1995); *Citizens for Washington Square v. City of Davenport*, 277 N.W.2d 882 (Iowa 1979); *Kansas Bar Ass'n v. Judges of the Third Judicial District*, 270 Kan. 489, 14 P.3d 1154 (2000); *Meredith v. Ieyoub*, 700 So. 2d 478 (La. 1997); *Associated Subcontractors of Massachusetts, Inc. v. University of Massachusetts Building Authority*, 442 Mass. 159, 810 N.E.2d 1214 (2004); *State v. Philip Morris Inc.*, 551 N.W.2d 490 (Minn. 1996); *Mississippi Manufactured Housing Ass'n v. Board of Aldermen*, 870 So. 2d 1189 (Miss. 2004); *Missouri Bankers Ass'n v. Director of the Missouri Division of Credit Unions*, 126 S.W.3d 360 (Mo. 2003); *Forest Guardians v. Powell*, 130 N.M. 368, 24 P.3d 803 (App. 2001); *Nodak Mutual Insurance Co. v. Ward County Farm Bureau*, 2004 N.D. 60, 676 N.W.2d 752 (2004); *Ohio Contractors Ass'n v. Bicking*, 71 Ohio St. 3d 318, 643 N.E.2d 1088 (1994); *Beaufort Realty Co. v. Beaufort County*, 346 S.C. 298, 551 S.E.2d 588 (App. 2001); *Curve Elementary School Parent & Teacher's Organization v. Lauderdale County School Board*, 608 S.W.2d 855 (Tenn. Ct. App. 1980); *Texas Ass'n of Business v. Texas Air Control Board*, 852 S.W.2d 440 (Tex. 1993); *Society of Professional Journalists, Utah Chapter v. Bullock*, 743 P.2d 1166 (Utah 1987) (applying the first and third prongs of the test, and discussing the second prong without specifically adopting it); *Parker v. Town of Milton*, 169 Vt. 74, 726 A.2d 477 (1998); *International Ass'n of Firefighters, Local 1789 v. Spokane Airports*, 146 Wash. 2d 207, 45 P.3d 186 (2002); *Snyder v. Callaghan*, 168 W. Va. 265, 284 S.E.2d 241 (1981).

The Department and CIPS urge this court not to adopt the doctrine of associational standing. For its part, the Department argues that Engineers' Union does not

meet the requirements for associational standing, a contention that we disagree with and address below. In arguing against associational standing, CIPS observes that a union is not simply the sum of its members, and union leadership does not necessarily reflect the views of union members. We believe, however, that the doctrine of associational standing serves important functions in the vindication of the rights of members of associations and in the preservation of scarce judicial resources. We agree with the Supreme Court's reasoning in rejecting a similar argument in *Brock*, 477 U.S. at 289-90, 91 L. Ed. 2d at 242-43, 106 S. Ct. at 2532-33:

"While a class action creates an ad hoc union of injured plaintiffs who may be linked only by their common claims, an association suing to vindicate the interests of its members can draw upon a pre-existing reservoir of expertise and capital. 'Besides financial resources, organizations often have specialized expertise and research resources relating to the subject matter of the lawsuit that individual plaintiffs lack.' [Citation.] These resources can assist both courts and plaintiffs. As one court observed of an association's role in pending litigation: '[T]he interest and expertise of this plaintiff, when exerted on behalf of its directly affected members, assure "that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult ... questions." ' [Citation.]

In addition, the doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others. 'The only practical judicial policy when people pool their capital, their interests, or their activities under a name and form that will identify collective interests, often is to permit the association or corporation in a single case to vindicate the interests of all.' [Citations.] The very forces that cause individuals to band together in an association will thus provide some guarantee that the association will work to promote their interests."

The circumstances of this case fully illustrate the

desirability of the doctrine of associational standing. The members of Engineers' Union sought unemployment compensation benefits for the period from June 22, 1993, until August 28, 1993. Under the Unemployment Insurance Act, an individual is entitled to maximum benefits of 49.5% of the statewide average weekly wage for each week the individual remains unemployed. See 820 ILCS 405/401 (West 1994). Drawing on the resources of the union facilitated presentation of the relatively minor claims of each member of Engineers' Union. Moreover, the resources of the judiciary are scarce and should be preserved where compatible with the effective administration of justice. As discussed below, the eligibility of the members of Engineers' Union to unemployment compensation benefits turns on common questions of law. Such questions are appropriately resolved in a lawsuit where Engineers' Union represents the vast majority of the 549 union members rather than in a multiplicity of lawsuits filed in different counties of this state. In light of these considerations, it is appropriate to adopt the doctrine of associational standing in Illinois.

Applying the *Hunt* associational standing test, we hold that Engineers' Union had standing to appeal the decision of the Director. First, Engineers' Union satisfies the first prong of the *Hunt* test because the members of Engineers' Union had standing to appeal the denial of benefits. The members of Engineers' Union filed individual claims for benefits and the Director denied the claims. Thus, the members of Engineers' Union were parties aggrieved by the decision of the Director and could seek judicial review of the Director's decision.

Second, Engineers' Union acted as the sole bargaining agent for its members with the purpose of furthering their work-related interests, particularly in income and benefits. In seeking review of the Director's decision, Engineers' Union sought to protect the interests of its

members to income and benefits. Such a goal could not be more germane to the purpose of the union. See *National Treasury Employees Union v. United States Merit Systems Protection Board*, 743 F.2d 895 (D.C. Cir. 1984) (noting the interests the union seeks to protect, the rights of its seasonal workers to adverse action protections when they are laid off for less than 30 days, are germane to its purposes as exclusive representative of those workers).

Third, neither the claim asserted nor the relief requested required the participation of individual union members. Upon successful negotiation of a contract, the members of Engineers' Union were eligible to return to work. Local 702 remained subject to the lockout, however, and the members of Engineers' Union refused to cross the picket lines. It is because of their refusal to cross the picket lines and because of a perceived interest that all members of Engineers' Union had in contributions by their employer to their health insurance plan, an interest affected by the outcome of the labor dispute between CIPS and Local 702, that the Director denied the claims for benefits. Thus, the suit by Engineers' Union did not require consideration of the individual circumstances of any aggrieved member of the union. Rather, the action raised questions of law: whether the members of Engineers' Union were ineligible to receive benefits because they had a direct interest in the labor dispute; and whether the members of Engineers' Union were of the same grade or class as the members of Local 702.

The present case is analogous to *Brock*, 477 U.S. at 287-88, 91 L. Ed. 2d at 241-42, 106 S. Ct. at 2531-32. In *Brock*, a union and several of its members filed an action challenging the Secretary of Labor's interpretation of the eligibility provisions of a statute that provided benefits to workers laid off because of competition from imports. Some of the union members had been denied benefits by

cooperating state agencies charged with processing the applications for benefits, some union members had been awarded benefits, and some union members were allegedly entitled to benefits but had not filed claims. The court of appeals determined that the union had failed to meet the third prong of the *Hunt* test because the union members had suffered injury in varying amounts requiring individualized proof, and the relief sought could not be obtained unless each individual claimant was a party plaintiff. The Supreme Court rejected this conclusion, finding participation of individual union members not necessary because the action involved a question of law. The Court explained:

"Neither these claims nor the relief sought required the District Court to consider the individual circumstances of any aggrieved UAW member. The suit raises a pure question of law: whether the Secretary properly interpreted the Trade Act's TRA eligibility provisions. [Citation.] And the relief requested, and granted by the District Court, leaves any questions regarding the eligibility of individual TRA claimants to the state authorities given jurisdiction over such questions by 19 U.S.C. § 2311(d). [Citation.] Thus, though the unique facts of each UAW member's claim will have to be considered by the proper state authorities before any member will be able to receive the benefits allegedly due him, the UAW can litigate this case without the participation of those individual claimants and still ensure that 'the remedy, if granted, will inure to the benefit of those members of the association actually injured' [citation]." *Brock*, 477 U.S. at 287-88, 91 L. Ed. 2d at 241-42, 106 S. Ct. at 2531-32.

Also analogous is *Brotherhood of Teamsters*, 190 Cal. App. 3d at 1515, 236 Cal. Rptr. at 78. In *Brotherhood of Teamsters*, the California Unemployment Insurance Appeals Board and several employers appealed a judgment of the trial court issuing a peremptory writ of mandate compelling the Board to set aside its decision to deny unemployment insurance benefits to certain claimants. The Board and employers maintained that the union did

not have standing to challenge the Board's decision to deny unemployment insurance benefits to the claimants. The court of appeal rejected this contention, finding that the union had met the third prong of the *Hunt* test:

"Here, as in *Brock*, the mandate proceeding raises a pure question of law, i.e., whether the Board properly interpreted section 1262 in denying its benefits to the union member claimants. Although the Board may have to determine each claimant's benefits, the unions may litigate this case without the participation of its members and still insure that the remedy, if granted, will inure to the benefit of those union members who have been injured." *Brotherhood of Teamsters*, 190 Cal. App. 3d at 1523, 236 Cal. Rptr. at 83.

The Department maintains that participation of the individual union members is necessary because an individual claimant's entitlement to benefits hinges on facts specific to that claimant of which the union would not have knowledge. We are not persuaded. The judicial proceedings raise pure questions of law. Awards of benefits are not at issue and would be determined by the administrative agency if the judicial review process results in a determination that the union members are eligible for benefits. To the extent, however, that the argument the Department makes is more properly described as an assertion that an association can never establish standing where the association seeks monetary damages on behalf of its members, we also reject this contention. As noted in *Brown Group*, the third prong of the *Hunt* test is "judicially fashioned and prudentially imposed." *Brown Group*, 517 U.S. at 558, 134 L. Ed. 2d at 771, 116 S. Ct. at 1537. It is a matter of "administrative convenience and efficiency." *Brown Group*, 517 U.S. at 557, 134 L. Ed. 2d at 770, 116 S. Ct. at 1536.[1] In light

---

[1]Indeed, in *Brown Group* the Court held that Congress may dispense with this requirement by statute. *Brown Group*, 517 U.S. at 558, 134 L. Ed. 2d at 771, 116 S. Ct. at 1537. The Court expressly reserved a determination as to whether, absent congres-

of the prudential nature of the third prong, we agree with the Supreme Court of Washington that an association may seek purely monetary damages on behalf of its members where the damages are certain, easily ascertainable, and within the knowledge of the defendant:

"[T]here are instances where the lack of individual participation by an association's members is not fatal to the association's standing because the amount of monetary damages sought on behalf of those members is certain, easily ascertainable, and within the knowledge of the defendant. In our judgment, this pragmatic view is preferable to a rule that serves to automatically deny standing to an association that seeks monetary damages on behalf of its members without alleging that it has been injured or that it has an assignment of the members' claim. The rule enunciated by Division Three in this case is, in our view, entirely reasonable and ensures fairness in cases where an individual association member's participation is not necessary to prove the damages that are asserted on behalf of the members by the association. In sum, Division Three's analysis affords a practical and sensible remedy to individual members who belong to an employee association and, perhaps, lack the means to bring a lawsuit on his or her own behalf. *See Save a Valuable Env't*, 89 Wn.2d at 867 (In determining associational standing courts consider the 'individual who is one of many harmed ... [and who] may be unable to afford the costs of challenging the action himself.'). If we reached the result advanced by Airport we would likely burden individual members of the employee association economically and would almost certainly burden our courts with an increased number of lawsuits

sional action, the third prong may be satisfied, noting: "United Food argues that 'given the simplified nature of the monetary relief here provided' [citation] the third prong of the *Hunt* test is satisfied despite its claim for damages. In light of our conclusion that in the WARN Act Congress has abrogated the third prong of the associational standing test, we need not decide whether, absent congressional action, the third prong would bar a 'simplified' claim for damages." *Brown Group*, 517 U.S. at 554 n.5, 134 L. Ed. 2d at 768 n.5, 116 S. Ct. at 1535 n.5.

arising out of identical facts. In short, we see little sense in an ironclad rule that has the effect of denying relief to members of an association based upon an overly technical application of the standing rules." *Spokane Airports*, 146 Wash. 2d at 215-16, 45 P.3d at 190.

Viewing the relief requested in the proceedings at bar as monetary damages, we would nevertheless hold that Engineers' Union had standing to appeal the denial of benefits. Under Illinois law, an award of benefits is calculated by application of a formula. See 820 ILCS 405/401 (West 1994). Certainly defendants have access to salary information for the union members and application of the formula is straightforward. We believe administrative convenience and efficiency are furthered by a determination, in one proceeding, that the numerous claimants are eligible, or ineligible, for benefits, even if the determination as to each individual claimant entails consideration of a limited number of facts pertinent to the individual. The alternative is 549 individual proceedings with separate determinations of eligibility or ineligibility to benefits and separate determinations of the actual awards of benefits.

The Department and CIPS maintain that Engineers' Union lacks standing for the additional reason that it was not *a party aggrieved by the Director's decision.* The Department and CIPS note that, pursuant to section 1100 of the Unemployment Insurance Act (820 ILCS 405/1100 (West 1994)), only the "party aggrieved by the decision of the Board of Review (or the decision of the Director rendered pursuant to Sections 800 and 801) may secure judicial review thereof." The Department and CIPS note further that the Administrative Review Law defines a decision of an agency as "any decision, order or determination of any administrative agency rendered in a particular case, which affects the legal rights, duties or privileges of parties and which terminates the proceedings before the administrative agency." 735 ILCS 5/3—

101 (West 1994). The Department and CIPS conclude that Engineers' Union could not appeal the Director's decision because Engineers' Union was not a party to the administrative proceedings and could not have been aggrieved by the Director's decision. We reject this conclusion because it fails to take into consideration the derivative nature of an association's standing in seeking review of an administrative agency ruling adverse to its members.

As noted above the members of Engineers' Union were proper parties to the administrative proceedings. Further, the members of Engineers' Union were aggrieved by the Director's decision denying their claims for unemployment insurance benefits, and they could appeal the Director's decision. 820 ILCS 405/1100 (West 1994). Consequently, the standing requirement limiting review to a party aggrieved by the agency's decision has been met *by the members of Engineers' Union.* It follows that Engineers' Union, as an organization meeting the requirements of the doctrine of associational standing, need not meet the standing requirement independently. Rather, Engineers' Union derives its standing from the standing of its members.

We find support in the Unemployment Insurance Act for application of the doctrine of associational standing. We note that the Act specifically provides for representation of a claimant by a union or other authorized agent. Section 820 of the Act provides:

"Representation. Any individual or entity in any proceeding before the Director or his representative, or the Referee or the Board of Review, may be represented by a union or any duly authorized agent." 820 ILCS 405/806 (West 1994).

Thus, the Act recognizes the particular relationship between a union and its members, and the benefits to union members of representation by the union. The Act allows the union to participate in a representative capacity to vindicate the interest of its members.

Engineers' Union represented the interests of its members in the administrative proceedings. As noted above, Engineers' Union appealed the decision of the claims adjudicator to the Director's representative. Engineers' Union continued its representation of its members before the Director, defending CIPS's claim that the union members were not eligible for benefits. What Engineers' Union sought to do in prosecuting the appeal to the circuit court was to represent its members in the same capacity as it represented them before the administrative agency.

We also find support in the persuasive analysis employed by the federal courts in construing the Administrative Orders Review Act, generally known as the "Hobbs Act." 28 U.S.C. § 2341 *et seq.* (1994). The Hobbs Act provides direct review by the court of appeals of rules, regulations, or final orders of certain federal administrative agencies. 28 U.S.C. § 2342 (1994). However, section 2344 of the Hobbs Act limits the right of review to parties to the administrative proceedings who are aggrieved by the decision of the administrative agency. 28 U.S.C. § 2344 (1994); *Erie-Niagara R. Steering Committee v. Surface Transportation Board,* 167 F.3d 111 (2d Cir. 1999); *Clark & Reid Co. v. United States,* 804 F.2d 3 (1st Cir. 1986). In interpreting the standing requirement of the Hobbs Act, the federal courts have afforded standing to associations representing the interests of their members.

In *Committee for Effective Cellular Rules v. Federal Communications Comm'n,* 53 F.3d 1309 (D.C. Cir. 1995), the court determined that an organization whose members were interested in filing applications for licenses to provide cellular service in unserved areas had standing to pursue an appeal on behalf of its members. The court first held that the individual members of the organization had standing to prosecute the appeal. Applying the

Hunt tripartite test, the court found that the organization had standing to prosecute the appeal because its individual members had standing; the interests the organization sought to protect were germane to the organization's purpose; and neither the claim asserted nor the relief requested required the participation of individual members in the lawsuit.

Likewise, in *National Treasury Employees Union*, 743 F.2d 895, the court determined that the union had standing to seek review of an order of the Merit Systems Protection Board excluding temporary layoffs of seasonal employees from the adverse action protections accorded to furloughs by statute. The court first determined that the interests the union sought to protect, the rights of its seasonal workers to the adverse action protections when they are laid off for less than 30 days, were germane to its purposes as exclusive representative of those workers. The court also determined that neither the claim asserted, that a regulation was invalid on its face, nor the relief requested, that the regulation be declared invalid, required the participation of individual union members in the suit. Turning to the standing requirement of the Hobbs Act, the court determined that the seasonal workers would have had aggrieved-party standing to sue because they suffered injury in fact as a result of the agency order, and the court could provide redress if it held the regulation invalid on appeal. The court concluded that "[b]ecause the individual employees represented by the [union] would therefore have been permitted to bring this suit, the union also has standing to sue the Merit Systems Protection Board." *National Treasury Employees Union*, 743 F.2d at 911.

At issue in *Rockford League of Women Voters v. United States Nuclear Regulatory Comm'n*, 679 F.2d 1218 (7th Cir. 1982), was the refusal of the Commission's Director of Nuclear Reactor Regulation to institute

proceedings to revoke Commonwealth Edison Company's permit to construct a nuclear electrical generating plant. The Rockford League of Women Voters sought review of the administrative agency's inaction. The court determined that the League of Women Voters had standing to maintain the action. The court reasoned:

"The standing of an organization is derivative of its members' standing [citation], so we must consider whether members of the Rockford League of Women Voters would have had standing to complain about the Director's action if they had filed this petition personally. They would have if they could show a threat of physical illness or injury. The League's request to the Director to initiate a permit-revocation proceeding alleged, plausibly enough given the proximity of Rockford to the construction site, that members of the League 'live near the site of the Byron Station'—near enough we should think to be endangered should the Byron plant be unsafe. This does not quite answer the standing question, because until the plant is actually licensed—there cannot be any danger to the inhabitants of Rockford. But the League further alleges that if the safety problems that it raised in its request to the Director are not solved before construction is completed they will never be solved—the Commission will be stampeded into granting a license regardless. This allegation is sufficient to confer standing ***." *Rockford League of Women Voters*, 679 F.2d at 1221-22.

See also *Hunt*, 432 U.S. at 346, 53 L. Ed. 2d at 396, 97 S. Ct. at 2443 (noting that "if the Commission has standing to litigate the claims of its constituents, it may also rely on them to meet the requisite amount in controversy"); *Connecticut Ass'n of Health Care Facilities, Inc. v. Worrell*, 199 Conn. 609, 508 A.2d 743 (1986) (association had standing because its members were aggrieved persons); *Brotherhood of Teamsters & Auto Truck Drivers*, 190 Cal. App. 3d at 1515, 236 Cal. Rptr. at 79 (finding that a union had standing to bring an action as the representative of its constituents where the union members were beneficially interested in the outcome of the proceeding).

Here, Engineers' Union filed the complaint for administrative review to protect the interests of its members. The agency's decision adversely affected the union members, who were parties to the administrative proceedings. Because the individual union members had standing to sue for administrative review, Engineers' Union had standing to bring the complaint on their behalf. We conclude that the Department and CIPS failed to show that Engineers' Union lacked standing to appeal the Director's decision. The circuit court properly denied their motions to dismiss. Having resolved the issue of standing, we turn to the merits of the case.

## II. Eligibility for Unemployment Insurance Benefits

### A. *Standard of Review*

We note at the outset our standard of review. The Unemployment Insurance Act provides that judicial review of the Director's decision must accord with the Administrative Review Law (735 ILCS 5/3—101 *et seq.* (West 1994)). 820 ILCS 405/1100 (West 1994); *Bridgestone/Firestone, Inc. v. Aldridge*, 179 Ill. 2d 141, 148 (1997). In turn, the Administrative Review Law provides that judicial review extends to all questions of law and fact presented by the entire record. 735 ILCS 5/3—110 (West 1994); *Bridgestone*, 179 Ill. 2d at 148. The statute specifically limits judicial review to the administrative record; the court may not hear new or additional evidence in support of or in opposition to the decision of the administrative agency. 735 ILCS 5/3—110 (West 1994). The statute additionally mandates that the "findings and conclusions of the administrative agency on questions of fact shall be held to be prima facie true and correct." 735 ILCS 5/3—110 (West 1994). Accordingly, an administrative agency's findings of fact should not be disturbed on review unless they are against the manifest weight of the evidence. *City of Belvidere v. Il-*

*linois State Labor Relations Board*, 181 Ill. 2d 191, 204 (1998); *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 88 (1992).

In this case, however, the facts are not in dispute. Thus, the issue before us is not whether the Director's findings of fact were against the manifest weight of the evidence. Rather, the Director's decision as to whether the members of Engineers' Union were eligible for unemployment compensation benefits depends solely on the application of the appropriate legal standard to the undisputed facts. This is a question of law (see *Bridgestone*, 179 Ill. 2d at 148; *Chicago Patrolmen's Ass'n v. Illinois Department of Revenue*, 171 Ill. 2d 263, 271 (1996); *City of Chicago v. Department of Revenue*, 147 Ill. 2d 484, 491 (1992) (and cases cited therein); *Caterpillar Tractor Co. v. Department of Revenue*, 29 Ill. 2d 564, 565-66 (1963)) which we review *de novo. City of Belvidere*, 181 Ill. 2d at 205 (and cases cited therein).

### B. *Direct Interest in the Dispute*

Citing section 604 of the Unemployment Insurance Act (820 ILCS 405/604 (West 1994)), the Department and CIPS maintain that the members of Engineers' Union were not eligible for unemployment compensation benefits because their unemployment was due to a stoppage of work resulting from a labor dispute. Conversely, Engineers' Union maintains that the relieving proviso of section 604 applies, and the members of Engineers' Union were eligible for unemployment compensation benefits.

Section 604 of the Act provides:

"Labor dispute. An individual shall be ineligible for benefits for any week with respect to which it is found that his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he is or was last employed. ***

\*\*\*

> This Section shall not apply if it is shown that (A) the individual is not participating in or financing or directly interested in the labor dispute which caused the stoppage of work and (B) he does not belong to a grade or class of workers of which immediately before the commencement of the stoppage there were members employed at the premises at which the stoppage occurs, any of whom are participating in or financing or directly interested in the dispute; provided, that a lockout by the employer or an individual's failure to cross a picket line at such factory, establishment, or other premises shall not, in itself, be deemed to be participation by him in the labor dispute." 820 ILCS 405/604 (West 1994).

There being no disagreement that the members of Engineers' Union were unemployed due to a stoppage of work which existed because of a labor dispute, we must determine whether the members of Engineers' Union fall within the relieving proviso of section 604.[2] The relieving proviso restores the employee to eligibility if the employee: (1) is not participating in, financing or directly interested in the labor dispute; and (2) does not belong to the same grade or class as the workers participating in or financing or directly interested in the dispute. It is incumbent upon the employee to prove both propositions. *Shell Oil Co. v. Cummins*, 7 Ill. 2d 329, 334 (1955).

The Director determined that the members of Engineers' Union had a direct interest in the labor dispute between CIPS and Local 702. The perceived interest

---

[2]We note that we are not called upon to determine whether there was a labor dispute "at the factory, establishment, or other premises" at which the claimants were last employed. Although the vast majority of its members worked at the power plants, separate facilities from the facilities where the members of Local 702 were employed, Engineers' Union does not present any argument based upon the situs of the labor dispute. Consequently, we do not consider whether there was a labor dispute at the power plants where all union employees were members of Engineers' Union.

involved medical health insurance premiums. CIPS made several medical health plans available to its employees, including a medical plan with a $100 deductible, several HMO medical plans, and "Salaried Plan B." In March 1993, the members of Engineers' Union elected to remain in the medical health plan with the $100 deductible. That selection was carried into the agreement for a new contract that CIPS and Engineers' Union entered into on June 21, 1993. The agreement also provided that CIPS's contribution for each employee, by coverage category, under the $100 deductible plan would be the same as CIPS's contribution for each employee, by coverage category, under Salaried Plan B.

In July 1992, CIPS and Local 702 reached an agreement on the terms of a new contract. The agreement provided that members of Local 702 would be insured under Salaried Plan B, like nonunion salaried employees of CIPS. The agreement, however, unraveled over the next months, and the parties operated under several extensions to their previous contracts. Shortly after the last extension expired on April 23, 1993, CIPS locked the workers out of its facilities.

As noted above, negotiations between CIPS and the unions continued during the lockout. In a letter dated August 6, 1993, CIPS noted that Local 702 had asked CIPS to consider providing insurance coverage to its members under the $100 deductible plan, while freezing the employee portion of the premiums through June 30, 1995. The letter noted further that CIPS offered to freeze employee premiums under the $100 deductible plan through September 30, 1994. On August 25, 1993, CIPS announced that it was ending the lockout of the members of Local 702, and the members of both unions returned to work. Several months later, in January 1994, CIPS and Local 702 entered into a new contract. The contract provided that members of Local 702 would be insured

under Salaried Plan B. CIPS agreed to make specific contributions for its employees under Salaried Plan B, and in accord with the provisions of its contract with Engineers' Union, CIPS made the same level of contributions under the $100 deductible plan that the members of Engineers' Union chose.

In finding that the members of Engineers' Union were directly interested in the labor dispute between CIPS and Local 702, the Director relied upon the link between the contributions that CIPS made for its employees under Salaried Plan B and the contributions CIPS made under the $100 deductible plan. The contributions CIPS made for the members of Engineers' Union under the $100 deductible plan increased to match the contributions CIPS made under Salaried Plan B. Because the members of Engineers' Union benefitted from the increased contributions toward their premiums under the $100 deductible plan, the Director concluded that the members of Engineers' Union had a direct interest in the outcome of the labor dispute between CIPS and Local 702.

The appellate court reversed, holding that the members of Engineers' Union did not have a direct interest in the outcome of the labor dispute between CIPS and the members of Local 702. The court reasoned:

"[W]here one union has a legally enforceable right to a benefit at issue in another union's dispute, the first union has a direct interest in the outcome of the dispute. By contrast, where the union has a mere expectancy in the outcome of another union's dispute, such as where the employer historically patterns its collective bargaining agreements with each of its unions after each other, our courts have not found a direct interest. [Citations.]

The situation presented by the instant case does not fit squarely within either of these categories, however. Local 702 had a choice to either leave Salaried Plan B—in which case Local 148 would *not* have a legally enforceable right to any increase that Local 702 negotiated—or remain in the

plan—in which case Local 148 *would* have a right to the increase. Presumably, Local 702 would choose whichever option afforded its members the greatest benefits. If it were able to negotiate a better premium payment by leaving Salaried Plan B, it would not be in Local 148's interest for Local 702 to succeed in getting the best possible deal. In short, the interests of the two unions did not directly coincide because the fortunes of Local 148 did not necessarily rise or fall with those of Local 702. Viewing this divergence of interests in light of the policy behind the requirement, we conclude that Local 148 did not have a direct interest in the outcome of the labor dispute." (Emphases in original.) 345 Ill. App. 3d at 395-96.

We disagree with the appellate court's conclusion.

The members of Engineers' Union had a direct interest in the labor dispute between CIPS and Local 702. Their contract specifically provided that CIPS would make contributions to their medical plan, the $100 deductible plan, in the same amounts as the contributions it made to Salaried Plan B. Thus, the members of Engineers' Union stood to benefit from any increase in the level of contributions to Salaried Plan B obtained by Local 702 as a result of the negotiations ending the labor dispute. To be sure the increase in the contributions to the $100 deductible plan was contingent upon Local 702 selecting Salaried Plan B and successfully bargaining for an increase in the level of contributions to Salaried Plan B. However, a level of contingency always exists where one union relies upon successful bargaining by another union for an increase in wages and benefits or an improvement in work conditions.

We contrast the present case with the circumstances in *General Motors Corp. v. Bowling*, 85 Ill. 2d 539, 542 (1981), and in *Cummins*, 7 Ill. 2d 329. In *General Motors Corp.*, this court rejected a claim that the members of a union representing the shop clerks at General Motors' plants in Chicago and LaGrange, Illinois, had a direct interest in a labor dispute between General Motors and

the members of another union representing the production workers at the plants. The court recognized that certain parts of the production workers' agreement with General Motors would customarily be copied into the shop clerks' own agreement. The shop clerks, therefore, might anticipate that the strike by the production workers would influence their terms of employment. That, however, was at most an indirect interest. The court explained: "All they had was a hope, not any assurance. A mere expectancy without any legal right, subject to GM's views on the fairness and convenience of adopting parts of another agreement, does not disqualify the shop clerks for unemployment benefits." *General Motors Corp.*, 85 Ill. 2d at 543.

In *Cummins*, 14 labor unions, including the Electricians, the Machinists and the Operating Engineers, were represented at a refinery. In addition to being affiliated with its corresponding international union, each of the local unions, with the exception of the Machinists and the Operating Engineers, belonged to the Metal Trades Council of Wood River. The international unions were affiliated with the Metal Trades Department of the American Federation of Labor. The purpose of the council and the department was to assist the individual unions in the conduct of their affairs and in negotiations with their employer.

In accordance with their customary practice and at the suggestion of the Metal Trades Council, negotiations for a new contract took place between the employer and a committee representing the Metal Trades Department and each of the 12 international unions. The resulting proposed agreement, although for the most part equally applicable to all the unions, was designed to cover problems peculiar to each craft. The agreement was signed by each of the local unions with the exception of the Pipefitters and Asbestos Workers, who demanded

increased wages and different working conditions. The Pipefitters and Asbestos Workers went on strike, curtailing operations at the refinery until after negotiations were held between the employer and the Pipefitters international union, and the strike was called off. Immediately thereafter, a strike was called and a picket line set up by the Operating Engineers, who were also demanding a wage concession. The new strike resulted in the continued shutdown of refinery operations. While the latter strike was in progress, the employer informed the Metal Trades Department that, in order to get all employees back to work, the employer was prepared to offer a substantial wage increase. Negotiations with the council, the department, and all 14 local unions resulted in an agreed wage increase for all employees, and an end to the strike by the Operating Engineers.

The claimants were members of the 10 unions which, along with the Pipefitters and Asbestos Workers, made up the Metal Trades Council. On appeal, the employer maintained that by participating in both the original negotiations and the subsequent negotiations on the wage increase, and by accepting the wage increase, the claimants made the dispute their own and were, therefore, directly interested in its outcome. The court rejected the employer's argument, reasoning:

"Representatives from each of the 12 unions met with the Company in the spring of 1950 for the purpose of negotiating a new labor contract, and as a result thereof, such an agreement was, on June 18, 1950, presented to each union for ratification. Thereafter, the claimants' unions accepted this contract and the Company continued to enjoy full production until the strike was called by the non-ratifying Pipefitters and Asbestos Unions. Any dispute which the ratifying unions may have had with the Company was settled by this agreement. *** It is true that the ratifying unions took part in the conference of September 21 and 22, and that the claimants received a wage increase thereafter. However, it must be noted that this conference

was called at the insistence of the Company and, as its superintendent testified, for the purpose of offering 'a general wage increase' as a result of 'a change in economic conditions of the country' which was brought about by the Korean War. In its reply brief the appellant admits 'that Shell's policy at the refinery has been not to make any substantial distinction in the wage rates paid to the various union crafts. In other words, a wage increase granted to one union would be granted to all.' On the other hand, there was no evidence, whatsoever, to show that the claimants either requested further wage negotiations or, absent the picket line, would have failed to honor the terms of their prior agreement had a wage increase not been forthcoming. From these facts, we feel it was reasonable to conclude that, as to the ten ratifying unions, any wage increase which they received was voluntarily tendered by the employer for the purpose of creating good will and of promoting harmonious employment relationships. By accepting this generosity, these claimants cannot be said to have become directly interested in the labor dispute." *Cummins*, 7 Ill. 2d at 335-36.

Turning to the case at bar, we conclude that the members of Engineers' Union had a right to increased contributions to their medical plans. Although the right depended in part on the actions of the members of Local 702, it was different in substance and nature than a mere expectancy. Where the terms achieved by the union involved in the labor dispute are applied to another union because of custom traditionally followed by the employer, a mere expectancy is involved that does not equate to a direct interest in the outcome of the labor dispute. Likewise, where the employer voluntarily offers better terms to all union members, the members of a nonstriking union do not have a direct interest in the outcome of the labor dispute. However, where one union's contract specifically provides that the union members will be the beneficiaries of terms negotiated by the union involved in the labor dispute, an enforceable right is at issue, although the right is contingent on the successful

outcome of the negotiations. In those circumstances, the members of the union have a direct interest in the outcome of the labor dispute.

To be eligible for unemployment insurance benefits under the relieving proviso of section 604, an employee must prove both that he is not directly interested in the labor dispute and that he is not of the same grade or class as employees who are participating in, financing or who hold a direct interest in the labor dispute. Our ruling that the members of Engineers' Union were directly interested in the labor dispute between CIPS and Local 702 renders the members of Engineers' Union ineligible for unemployment insurance benefits. Consequently, we need not consider whether the members of Engineers' Union were of the same grade or class as the members of Local 702.

## CONCLUSION

For the foregoing reasons, we agree with the rulings of the appellate court and the circuit court of Franklin County, finding that Engineers' Union had standing to appeal the Director's decision. However, we find that the members of Engineers' Union had a direct interest in the outcome of the labor dispute between CIPS and Local 702. Consequently, the members of Engineers' Union were ineligible for unemployment compensation benefits. We therefore reverse the circuit court's and appellate court's judgments and confirm the decision of the Department.

*Judgments reversed;*
*Department confirmed.*

JUSTICE KARMEIER took no part in the consideration or decision of this case.

JUSTICE THOMAS, specially concurring:
Although I agree that the members of Engineers'

Union were ineligible for unemployment compensation benefits, that is not why I join in the decision to reverse the judgments below. Instead, my decision to reverse is based upon Engineers' Union's lack of standing to appeal the Director's decision.

It is well established that "the right to review such administrative decisions is limited to *parties of record* before the administrative agency whose rights, duties or privileges were adversely affected by the decision." (Emphasis added.) *Williams v. Department of Labor*, 76 Ill. 2d 72, 78 (1979). This principle is particularly compelling in this case, where the relevant statutes and regulations specifically define who may appear as a party before the Department and who may appeal from that agency's decisions.

Administrative regulations have the force and effect of law and are construed according to the same standards that govern the construction of statutes. *Union Electric Co. v. Department of Revenue*, 136 Ill. 2d 385, 391 (1990). The fundamental rule of statutory construction is to ascertain and give effect to the legislature's intent. *Michigan Avenue National Bank v. County of Cook*, 191 Ill. 2d 493, 503-04 (2000). The best indication of legislative intent is the statutory language, given its plain and ordinary meaning. *Illinois Graphics Co. v. Nickum*, 159 Ill. 2d 469, 479 (1994). Where the language is clear and unambiguous, we must apply the statute without resort to further aids of statutory construction. *Davis v. Toshiba Machine Co., America*, 186 Ill. 2d 181, 184-85 (1999).

Under both the Unemployment Insurance Act and the Administrative Review Law, only *a party to the administrative proceeding* may seek judicial review of the Director's decision. Section 1100 of the Unemployment Insurance Act states that "[a]ny decision of the Board of Review (or of the Director in cases of decisions made pursuant to Sections 800 and 801) shall be reviewable

only under and in accordance with the provisions of the Administrative Review Law, provided that judicial review thereof shall be permitted only after *any party claiming to be aggrieved thereby* has exhausted his administrative remedies as provided by this Act." (Emphasis added.) 820 ILCS 405/1100 (West 2002). The Administrative Review Law, in turn, defines "administrative decision" as "any decision, order or determination of any administrative agency rendered in a particular case, which affects the legal rights, duties or privileges of *parties* and which terminates the proceedings before the administrative agency." (Emphasis added.) 735 ILCS 5/3—101 (West 2002). That judicial review is specifically limited to parties is significant, as the Illinois Administrative Code specifically defines "party," for purposes of the Unemployment Insurance Act, as "the claimant and any employing unit which files a timely and sufficient protest." 56 Ill. Adm. Code § 2720.1 (2002).

If the right to seek judicial review is limited to parties, and the definition of "party" is limited to claimants and employing units, then it is necessarily true that judicial review is limited to claimants and employing units who actually appeared before the Department. Here, there is no dispute that Engineers' Union did not appear as a party before the Department. As importantly, Engineers' Union *could not have appeared* as party before the Department, as it is neither a claimant nor an employing unit. Accordingly, under both this court's decision in *Williams* and the relevant statutes and regulations, Engineers' Union had no standing to appeal the Director's decision. The judgments below must therefore be reversed.

That said, I wish to emphasize that I express no opinion on the doctrine of collective standing *per se*, which may or may not deserve a place in Illinois law. My position is simply that the doctrine has no place in this particular context.

JUSTICE GARMAN joins in this special concurrence.

JUSTICE KILBRIDE, concurring in part and dissenting in part:

I concur in part I of the majority's opinion, holding the IUOE, Local 148, has standing to appeal the Director's decision denying unemployment benefits to its members. 215 Ill. 2d at 61. I respectfully dissent, however, to part II of the majority's opinion, holding the members of Local 148 ineligible for unemployment benefits. 215 Ill. 2d at 70.

Under section 604 of the Act (820 ILCS 405/604 (West 1994)), the members of Local 148 were "ineligible [for benefits] only if both (1) their unemployment was due to a stoppage of work which existed because of a labor dispute at the premises where they worked, and (2) they or others of their grade or class were participating in, financing, or *directly interested* in the labor dispute." (Emphasis added.) *General Motors Corp. v. Bowling*, 85 Ill. 2d 539, 542 (1981). Under the facts of this case, the only issue is whether the members of Local 148 belonged to a grade or class of workers who were directly interested in the labor dispute between CIPS and Local 702.

I believe the members of Local 148 were not of the same grade or class as the members of Local 702. This court's decision in *Shell Oil Co. v. Cummins*, 7 Ill. 2d 329 (1955), is directly on point, and I disagree with the majority that *Cummins* is distinguishable (215 Ill. 2d at 69-70). In *Cummins*, this court found that although the unions involved were affiliated by membership in the Metal Trades Council, there was no evidence to show the unions surrendered their autonomous nature. *Cummins*, 7 Ill. 2d at 337. This court reasoned:

"Each union was free to act jointly or independently in presenting and enforcing its employment demands, and without regard to the wishes of the others. It is true that in many cases, a single agreement indicates that all

employee parties thereto are of the same grade and class. However, it is only one factor which must be considered and is not, in and of itself, conclusive. It is our opinion that these claimants did not belong to a grade or class of workers who participated in, financed, or were directly interested in this labor dispute." *Cummins*, 7 Ill. 2d at 337-38.

In the present case, Local 148 represented employees at the Coffeen, Meredosia, Hutsonville, and Grand Tower facilities. Local 702 represented employees at the Newton facility and the Eastern, Southern and Western divisions. The sole overlap occurred at the Grand Tower facility, where Local 702 represented 12 workers in the production department. These employees were included in Local 702's Southern division bargaining unit. Nevertheless, each facility division was covered by a separate collective-bargaining agreement. Not only did each union enter into separate contracts, each contract required ratification by the respective members of each union. I believe each union was autonomous, being "free to act jointly or independently in presenting and enforcing its employment demands, and without regard to the wishes of the others." *Cummins*, 7 Ill. 2d at 337-38. I would therefore conclude that the members of Local 148 were not of the same grade or class as the members of Local 702.

I also agree with the appellate court that the members of Local 148 did not have a direct interest in the outcome of the labor dispute between CIPS and Local 702. Although Local 148 would benefit if Local 702 elected insurance coverage under Salaried Plan B and successfully bargained for higher contributions by CIPS to the medical plan, Local 702 was under no obligation to select coverage under the plan. Indeed, during the negotiations, Local 702 asked CIPS to consider providing insurance coverage to its members under the $100 deductible plan, while freezing the employee portion of the premiums through June 30, 1995. Had Local 702 bargained for

coverage under another medical health plan, Local 148 would not have received an increase in the contributions toward the $100 deductible plan *as a result of bargaining by Local 702*. The appellate court noted:

"Presumably, Local 702 would choose whichever option afforded its members the greatest benefits. If it were able to negotiate a better premium payment by leaving Salaried Plan B, it would not be in Local 148's interest for Local 702 to succeed in getting the best possible deal." 345 Ill. App. 3d at 396.

This court has likewise held that the mere expectancy of better economic terms does not give rise to a direct interest in a labor dispute. See *General Motors Corp.*, 85 Ill. 2d 539. In *General Motors Corp.*, the court rejected a claim that the members of a union representing the shop clerks at General Motors' plants in Chicago and La-Grange, Illinois, had a direct interest in a labor dispute between General Motors and the members of another union representing the production workers at the plants. The court recognized that certain parts of the production workers' agreement with General Motors would customarily be copied into the shop clerks' own agreement. The shop clerks, therefore, might anticipate that the strike by the production workers would influence their terms of employment. That, however, was at most an indirect interest. The court explained: "All they had was a hope, not any assurance. A mere expectancy without any legal right, subject to GM's views on the fairness and convenience of adopting parts of another agreement, does not disqualify the shop clerks for unemployment benefits." *General Motors Corp.*, 85 Ill. 2d at 543. See also *Cummins*, 7 Ill. 2d 329; *Nestle Co. v. Johnson*, 68 Ill. App. 3d 17 (1979).

Here, Local 148's agreement with CIPS concerning medical benefits was not contingent in any way on CIPS negotiations with Local 702, and nothing in the agreement between Local 148 and CIPS directly tied Local 148

to any benefit Local 702 might receive. Local 148 agreed to accept whatever contributions CIPS gave to all its employees insured under Salaried Plan B, including nonunion employees. Local 148 had already reached an agreement with the employer that was binding, regardless of the outcome of the negotiations between Local 702 and CIPS. The members of Local 148 had no control over the health insurance agreement reached by Local 702 and CIPS. In fact, the conduct of CIPS in negotiating the final health insurance agreement was a variable completely outside Local 148's control. If CIPS had never offered the health insurance plan accepted by Local 702, then Local 148 would have received no benefit whatsoever from those negotiations. Any benefit Local 148 members may have expected to receive from resolution of the dispute between CIPS and Local 702 was speculative at best. Consequently, the mere possibility of increased contributions toward their medical plan did not equate to a direct interest of the members of Local 148 in the outcome of the labor dispute between CIPS and Local 702.

It is, therefore, my opinion that the members of Local 148 were not directly interested in the labor dispute between CIPS and Local 702. Accordingly, I would conclude that the members of Local 148 were eligible to receive unemployment benefits.

The majority, however, asserts that Local 148 had more than a mere expectancy of better economic terms because the union members would have a legally enforceable right to increased contributions based on the success of negotiations between Local 702 and CIPS. 215 Ill. 2d at 69-70. Any such "legally enforceable right," however, was contingent and tenuous. Nothing in the language of the contract gave Local 148 any enforceable rights based on Local 702's negotiations. In fact, the record in this case shows that at the time Local 148 entered into its

agreement with CIPS (1) it appeared that Local 702 would not participate in Salaried Plan B; (2) there was no indication any premium support would be provided under Salaried Plan B; and (3) there was no indication the lockout of Local 702 was related to the issue of premium support. As the appellate court correctly observed: "the interests of the two unions did not directly coincide because the fortunes of Local 148 did not necessarily rise or fall with those of Local 702." 345 Ill. App. 3d at 396.

Moreover, the legislature's declared public policy underlying the Unemployment Insurance Act is to lighten the burden of involuntary unemployment that "so often falls with crushing force upon the unemployed worker and his family." 820 ILCS 405/100 (West 1992); see *Panther Creek Mines, Inc. v. Murphy*, 390 Ill. 23, 28 (1945) (the purpose of unemployment compensation is "to alleviate the distress and suffering occasioned by involuntary unemployment"); see also *Outboard, Marine & Manufacturing Co., Johnson Motors Division v. Gordon*, 403 Ill. 523, 536-37 (1949) ("the legislature intended to provide for the innocent victims of a labor dispute by specifically excluding them from the denial of unemployment compensation"). Accordingly, the Act is to be liberally construed to provide financial assistance to those who are unemployed through no fault of their own. *Bridgestone*, 179 Ill. 2d at 155; *Cummins*, 7 Ill. 2d at 339. The policy behind the Act mandates the members of Local 148 be eligible for unemployment compensation benefits.

For the foregoing reasons, I concur in part and respectfully dissent in part.